*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0216P (6th Cir.)
File Name: 02a0216p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

CHANITA FARMER,
          *Plaintiff-Appellant,*

          *v.*                                            No. 00-4613

CLEVELAND PUBLIC POWER
and CITY OF CLEVELAND,
          *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 99-00806—Patricia A. Gaughan, District Judge.

Submitted: June 19, 2002

Decided and Filed: June 28, 2002

Before: COLE and GILMAN, Circuit Judges; MILLS,
Senior District Judge.

───────────────

*The Honorable Richard Mills, Senior United States District Judge
for the Central District of Illinois, sitting by designation.

———————

**COUNSEL**

**ON BRIEF:**  Jose M. Gonzalez, CITY OF CLEVELAND LAW DEPARTMENT, OFFICE OF DIRECTOR OF LAW, Cleveland, Ohio, for Appellees.  Chanita Farmer, Cleveland, Ohio, pro se.

———————

**OPINION**

———————

RONALD LEE GILMAN, Circuit Judge.  Chanita Farmer brought this lawsuit against her employers, Cleveland Public Power (CPP) and the City of Cleveland, alleging (1) a violation of her First Amendment rights, (2) the commission of a public-policy tort, (3) racial and gender discrimination, (4) the existence of a hostile work environment, and (5) retaliation following her complaints about the purported discrimination.  The district court granted the defendants' motion for summary judgment with respect to Farmer's first four claims, but allowed her retaliation claim to proceed to trial.  At trial, the jury returned a unanimous verdict in favor of the defendants.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.  Factual background

Farmer, an African-American woman, began working for CPP as a Personnel Administrator in September of 1992. Her initial responsibilities included managing the personnel and payroll unit, supervising staff, reviewing performance evaluations, conducting disciplinary hearings, and serving as the contact person for CPP's GATE program (now called the Employee Assistance Program), which provides support to employees facing psychological, marital, or other emotional

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

problems. She was also involved in formulating policies regarding human resources, employee recruitment and benefits, and compliance with federal employment and labor laws.

Within a few years, however, work-related problems began to develop. Farmer was suspended on several occasions for conduct unbecoming an employee in the public service. In the first disciplinary action, CPP Commissioner Nagah Ramadan suspended Farmer for three days in June of 1995. This suspension was in response to a physical altercation that Farmer had with one of her coworkers and a security officer in CPP's public space on May 15, 1995.

Farmer's second suspension occurred in December of 1995. This ten-day suspension was the result of an incident that occurred on November 28, 1995, when Farmer confronted a coworker and interrupted Ramadan by shouting at the commissioner in CPP's public space.

Her third suspension took place on August 28, 1998. This disciplinary action, a one-day suspension without pay, was the result of an altercation that occurred earlier that month, when Farmer again argued with a coworker in CPP's public space.

Farmer's work responsibilities gradually changed over the course of her employment with CPP. The first modification occurred in May of 1994, when several of her duties were assigned to another employee. Approximately two years later, in March of 1996, Ramadan reprimanded Farmer for altering a coworker's payroll records. Several months after the reprimand, another employee became the contact person for all payroll and personnel matters. Farmer stopped receiving interoffice correspondence regarding labor relations around the same time. The next decrease in Farmer's responsibilities occurred in December of 1996, when Ramadan transferred more of the duties that Farmer had previously performed to another employee who became a Personnel Administrator. Finally, Farmer's role as the contact person for the GATE

program terminated in June of 1997, when a different person was assigned that duty.

The performance evaluations that Farmer received for 1996-1997 and for 1999—the only reviews that appear in the record—gave her ratings of 1.96 and 2.025, respectively. A score of 5.0 was the highest possible rating. The 1996 evaluation indicated that Farmer's responsibilities had been reduced as a result of her failure to manage the personnel area efficiently and effectively.

Farmer expressed interest in transferring to another City department in August of 1998. She subsequently applied for eight positions with the City in late August and early September of that year. None of the applications resulted in Farmer being offered a new job. During the open-applications period of March 1 to 12, 1999, Farmer again sought to obtain a different position by submitting applications for eight job openings within CPP. Farmer once more was not offered a new position.

In response to her suspensions, the reduction in her duties, her negative performance evaluations, and the various confrontations that she had had with her superiors, Farmer filed charges of discrimination with the Equal Employment Opportunities Commission (EEOC) on seven different occasions between December of 1996 and January of 2000. She also complained about her treatment in various internal grievance proceedings that she submitted to CPP officials and to the City's Department of Personnel and Human Resources, Division of Equal Employment Opportunity. Despite these various charges and grievances, Farmer continues to be employed by CPP as a Personnel Administrator.

## B.   Procedural background

This lawsuit was filed in the United States District Court for the Northern District of Ohio in April of 1999. Farmer's complaint, as amended, contains five causes of action. Her first count, brought under 42 U.S.C. § 1983, alleges that the

Actionable harassment exists if "the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). But as the elements of a prima facie case indicate, a racial or sexual hostile work environment claim is cognizable only if the purported harassment, viewed in conjunction with all of the circumstances, occurred because of the employee's race or gender. *Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999) (recognizing the necessity of considering the "totality of the circumstances" and explaining that "even though a certain action may not have been specifically racial in nature, it may contribute to the plaintiff's proof of a hostile work environment if it would not have occurred but for the fact that the plaintiff was African American"); *Williams*, 187 F.3d at 565 ("*Any* unequal treatment of the employee *that would not occur but for the employee's gender* may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII.").

We agree with the district court's conclusion that Farmer failed to raise a genuine issue of material fact regarding her hostile work environment claim. She has not pointed to any remarks or actions indicating any consideration of her race or gender. Nor has she shown that other African-Americans or women were exposed to unwelcome racial or sexual harassment. *Cf. Jackson*, 191 F.3d at 660-61 (holding that the district court erred in attaching no significance to the discriminatory comments that had been made to other African-American employees, even if not directed at the plaintiff). As a result, we conclude that Farmer has failed to present a prima facie claim of a hostile work environment based upon her race or gender. The district court therefore did not err in granting summary judgment to the defendants with respect to this claim.

did not err in granting summary judgment to the defendants with respect to Farmer's discrimination claims.

### E.   Hostile work environment

The final claim that was dismissed in the district court's partial grant of summary judgment is Farmer's allegation that the defendants created a hostile work environment. To support this claim, Farmer's complaint alleges that the defendants restricted her access to necessary information, gave her conflicting and vague performance objectives, ignored her requests for clarification of her targeted goals, and prepared performance evaluations based upon expectations that had not been discussed with her. Farmer's response to the defendants' motion for summary judgment includes several additional bases for her hostile work environment claim, including her contention that she was subjected to hostility and retaliation, physically isolated from her coworkers, and disciplined for actions that she did not take. She also argued that the defendants refused to respond to her requests for promotions and transfers, and that a number of her responsibilities were performed by other employees without her knowledge.

An employee asserting a violation of Title VII based upon a hostile work environment must establish that (1) she was a member of a protected group, (2) she was subjected to unwelcome harassment, (3)  the harassment was based upon the employee's protected status, such as race or gender, (4) the harassment affected a term, condition, or privilege of employment, and (5) the defendant knew or should have known about the harassing conduct but failed to take any corrective or preventive actions. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir. 1999) (discussing the requirements for proving a hostile work environment claim based upon gender); *Moore v. KUKA Welding Sys. & Robot. Corp.*, 171 F.3d 1073, 1078-79 (6th Cir. 1999) (setting forth the elements of a prima facie case for a claim of a hostile work environment based upon race).

defendants violated her First Amendment rights by taking hostile and retaliatory actions against her because of her statements accusing CPP of political nepotism. The second count alleges that the defendants committed a public-policy tort because they failed to adhere to the statutes, rules, and regulations governing the Civil Service System in Ohio as a result of their purported political nepotism. Farmer's final three counts allege that the defendants violated Title VII of the Civil Rights Act of 1964 by (1) discriminating against her on the basis of race and gender, (2) retaliating against her for filing charges of discrimination with the EEOC, and (3) creating a hostile work environment.

The defendants filed a motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, in June of 2000. Four months later, the district court partially granted the defendants' motion. The court concluded that (1) Farmer had not engaged in speech that is protected by the First Amendment, (2) her public-policy tort claim failed because it was premised upon the same facts and involved the same elements as her First Amendment claim, (3) she was unable to establish a prima facie case of racial or gender discrimination, because Farmer had not presented a genuine issue of material fact as to whether she was qualified for any of the positions that she sought, and (4) Farmer's hostile work environment claim failed because she did not present any evidence of harassment based upon race or gender. With respect to Farmer's retaliation claim, however, the court concluded that genuine issues of material fact remained as to whether the adverse employment actions that Farmer experienced constituted retaliation for her decision to file charges of discrimination with the EEOC. The district court therefore denied the defendants' motion for summary judgment regarding Farmer's retaliation claim.

As a consequence of the district court's summary judgment order, Farmer's retaliation claim proceeded to trial in November of 2000. The jury returned a unanimous verdict in favor of the defendants, the propriety of which is not being

challenged on appeal. This timely appeal instead contests all aspects of the district court's order that granted summary judgment in favor of the defendants.

## II.  ANALYSIS

### A.  Standard of review

A district court's grant of summary judgment is reviewed de novo. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering such a motion, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.  First Amendment claim

Farmer's first cause of action alleges that the defendants retaliated against her and removed many of her job responsibilities because she accused them of engaging in political patronage, unfair management, and violations of federal law. To support her claim, Farmer identifies two instances of what she contends was protected speech. In one of these instances, she avers that Commissioner Ramadan asked her to deny a light-duty position to a pregnant employee who was having difficulties performing her regular duties. Farmer claims in her affidavit that she told Ramadan that such openings were available, but that he told her to deny the pregnant employee's request anyway. In her response to the defendants' motion for summary judgment, Farmer adds that she confronted Ramadan about the illegality of this action and that he subsequently became angry and upset with her. Farmer's affidavit, however, does not support her contention

Farmer is a member of two protected groups. They contend, however, that Farmer failed to satisfy any of the remaining elements of the prima facie case.

In granting the defendants' motion for summary judgment with respect to Farmer's discrimination claims, the district court assumed for the purpose of its analysis that Farmer complied with the required application procedures for each of the positions she sought. The court then concluded that Farmer failed to present any evidence to support her contention that she was qualified for the promotions. As the district court noted, Farmer identified the specified qualifications for only two of the positions in question—that of Labor Relations Manager and of Assistant Director of Public Utilities. The prerequisites for those positions, however, appeared on unauthenticated documents, and there was no indication that the minimum qualifications listed on those documents were comprehensive. In fact, one of the documents was an internal personnel form indicating that another person had been approved for the position of Assistant Director of Public Utilities. The notice of the opening for the other position, that of Labor Relations Manager, appeared on a job posting, but it specified that the applicant would need to have five years of experience managing labor relations for a large public employer or equivalent experience and familiarity with the grievance process. Farmer did not present any evidence that she met those requirements.

The absence of any authenticated job postings setting forth the minimum requirements for the various positions prevents us from being able to evaluate the merits of Farmer's contention that she was qualified for each of the positions. We therefore agree with the district court's conclusion that Farmer has failed to establish a prima facie case of discrimination based upon race or gender, because she did not present evidence that she was qualified for any of the positions to which she applied. As a result, the district court

## D.  Race and gender discrimination

Farmer next alleges that the defendants discriminated against her on the basis of her race and gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, by refusing to promote her to any of the positions for which she applied.  In order to establish a Title VII employment discrimination claim, a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000) (setting forth the requirements for racial discrimination claims).  Farmer did not offer any direct evidence of discrimination.  As a result, the burden-shifting approach first set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), and later refined by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), applies to the present case. *Johnson*, 215 F.3d at 572.

Under the *McDonnell Douglas* framework, the plaintiff faces the initial burden of presenting a prima facie case of discrimination. *Id.*  The establishment of a prima facie case creates a rebuttable presumption of discrimination and requires the defendant to "articulate some legitimate, nondiscriminatory reason" for taking the challenged action. *Id.* at 573 (internal quotation marks omitted).  If the defendant is able to satisfy this burden, the plaintiff must then "prove that the proferred reason was actually a pretext to hide unlawful discrimination." *Id.*

A prima facie case of discrimination based upon a failure to promote requires the plaintiff to prove that (1) she was a member of a protected group, (2) she applied for and was qualified for the desired position, (3) she was considered for and denied the promotion, and (4) the position remained open after her rejection or went to a less-qualified applicant who was not a member of the protected group. *Roh v. Lakeshore Estates, Inc.*, 241 F.3d 491, 497 (6th Cir. 2001).  The defendants concede that, as an African-American woman,

that she confronted Ramadan or that he became angry with her.

The second instance that Farmer relies upon involves a grievance that she filed with the Civil Service Commission in December of 1998, alleging that Commissioners Majer and Ramadan violated Cleveland's charter by not preparing and administering civil service examinations for nonbargaining unit positions.  According to Farmer's grievance, this action adversely impacted African-American female employees such as herself because it denied them opportunities for promotion.

The district court concluded that neither of these instances involved constitutionally protected speech, because Farmer was not addressing matters of public concern.  Instead, the court determined that Farmer, through these statements, was simply carrying out her duties as a public employee and seeking to advance her own career, respectively.

A plaintiff alleging unconstitutional retaliation in violation of the First Amendment's guarantee of freedom of speech must establish three elements:

(1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998).

To determine whether a public employee's speech is entitled to constitutional protection, we apply a two-part inquiry. *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1186 (6th Cir. 1995) (noting that the Supreme Court has established a "two step analysis for determining when the discharge of a public employee violates the First Amendment").  First, the plaintiff must establish that his or her speech was related to a

matter of public concern. *Connick v. Myers*, 461 U.S. 138, 146 (1983) (explaining that determining whether an employee's speech pertains to a matter of public concern is the threshold question in evaluating a plaintiff's First Amendment retaliation claim). This step of the analysis presents a purely legal question. *Id*. at 148 n.7 ("The inquiry into the protected status of speech is one of law, not fact.").

The second stage of the inquiry, which occurs only if the speech in question involved a matter of public concern, requires balancing the plaintiff's free-speech interests against the government's interests as an employer. *Id*. at 146, 149-54 (explaining that if a plaintiff's speech does not pertain to a matter of public concern, "it is unnecessary for us to scrutinize the reasons for her discharge"); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) ("The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.").

In *Connick*, the Supreme Court explained that speech touches upon matters of public concern where it can "be fairly considered as relating to any matter of political, social, or other concern to the community . . . ." *Connick*, 461 U.S. at 146. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id*. at 147-48 (footnote omitted). These considerations differentiate between an employee's speech that touches upon matters of public concern and speech that is of particular interest only to the speaker. The latter, unlike the former, cannot form the basis of a First Amendment retaliation lawsuit. *Id*. at 147 ("We . . . hold that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review

## C.   Ohio public-policy tort

Farmer's second cause of action alleges that CPP violated Ohio public policy because it engaged in political nepotism. CPP's actions, Farmer contends, were in direct contravention of the statutes, rules, and regulations governing the Civil Service System in Ohio. In addressing this contention, the district court noted that Farmer relied upon the same arguments in support of both her First Amendment and her public-policy tort claims, because both contain identical elements. The district court therefore concluded that the defendants were entitled to summary judgment on Farmer's public-policy tort claim for the same reasons that summary judgment as to Farmer's First Amendment claim was appropriate. Our de novo review reveals no errors in the district court's analysis.

On appeal, Farmer does not challenge the district court's reasoning that her First Amendment and public-policy tort claims both involved the same elements. Nor does she contend that different facts support these two claims. Instead, Farmer quotes from an Ohio state-court case in which the court discussed the statutory requirements for Ohio's Civil Service System. This exposition of Ohio law provides no support for Farmer's public-policy tort claim, however, because she does not point to any facts showing that the defendants violated the pertinent legislation. For these reasons, we conclude that she has failed to present a viable public-policy tort claim. The district court therefore did not err in granting summary judgment to the defendants on Farmer's second cause of action.

Where Farmer falters, however, is in establishing the final element of a First Amendment retaliation claim. This element consists of evidence "that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights." *Bloch*, 156 F.3d at 678. To satisfy this causation requirement, Farmer must "point to specific, nonconclusory allegations reasonably linking her speech to employer discipline." *Bailey*, 106 F.3d at 144 (internal quotation marks omitted). The fact that an adverse employment action occurred after the exercise of free speech, without more, is insufficient to establish the link that is central to a First Amendment retaliation claim. *Id*. at 144-45 ("[W]hen opposing a motion for summary judgment, the nonmoving party may not rely on the mere fact that an adverse employment action followed speech that the employer would have liked to prevent. Rather, the employee must link the speech in question to the defendant's decision to dismiss her." (internal citation omitted)).

Applying these considerations to the present case, we conclude that Farmer has failed to present any evidence that would support a finding that her speech was a substantial or motivating factor in the defendants' decision to diminish her job responsibilities. The uncontroverted evidence instead suggests that her duties were altered because she was not performing them adequately and was repeatedly involved in confrontations with her supervisors and coworkers. Although her grievance preceded several reductions in her responsibilities, this temporal connection alone, as noted above, is insufficient to create a genuine issue of material fact with respect to the causation requirement. Farmer has therefore failed to establish an essential element of her First Amendment retaliation claim. *Id*. at 145-46 (concluding that because Bailey failed to present any evidence that would allow a reasonable juror to find that she was terminated due to her speech, the district court properly granted summary judgment in favor of the defendants). The district court therefore did not err in granting summary judgment to the defendants on Farmer's First Amendment claim.

the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.").

According to the defendants, neither of the speech incidents that Farmer identified meets the *Connick* test. With respect to Farmer's allegations regarding the instructions that Commissioner Ramadan gave her to deny a light-duty position to a pregnant employee, the defendants argue that Farmer was simply performing her duties as a Personnel Administrator, not addressing a matter of public concern. The defendants similarly contend that the grievance that Farmer filed with the Civil Service Commission is not protected by the First Amendment, based upon their argument that Farmer's sole motivation in submitting it was to present her personal concerns about unfair working conditions and about her inability to obtain a promotion.

As noted above, we must consider "the content, form, and context" of these statements to determine whether they touched upon matters of public concern. *Connick*, 461 U.S. at 147-48. Applying these factors to Farmer's encounter with Commissioner Ramadan regarding the availability of light-duty positions at CPP, we note that the record before us does not support Farmer's contention that she confronted Ramadan about the illegality of his actions or that he became upset with her as a result of her challenging his instructions. Instead, Farmer's affidavit simply avers that she told Ramadan that light-duty positions were available, but that he told her to deny the employee's request for such an opening.

This scenario, even when viewed most favorably to Farmer, does not support the conclusion that Farmer's purpose or intent was to alert Ramadan that CPP was failing to abide by relevant laws, or that she was challenging the legality of his directive. Instead, she appears to have made her comments solely in her role as a Personnel Administrator. Farmer took no action following her exchange with Ramadan that would support the conclusion that she was concerned with or troubled by his instructions. When analyzed in this context,

Farmer's speech appears to be a routine matter within the general scope of her duties as a CPP employee, not a statement touching upon a subject of general public concern. *Dambrot*, 55 F.3d at 1187-88 (examining "the point of the speech in question," "to what purpose the employee spoke," "the intent of the speech," and "the communicative purpose of the speaker" to determine that the employee's use of a racial epithet did not touch upon a matter of public concern (internal quotation marks, emphasis, and citation omitted)).

The other alleged incident, involving Farmer's Civil Service Commission grievance, is a much closer call. Despite the defendants' focus on Farmer's motivation regarding this grievance, they fail to recognize that it might be viewed as "mixed speech," involving both personal and public matters. *Bonnell v. Lorenzo*, 241 F.3d 800, 812 (6th Cir. 2001) (recognizing that the First Amendment protects speech involving "mixed questions of private and public concern, where the employee is speaking both as a citizen as well as an employee"). Farmer's complaint about her failure to be promoted, which was the focus of the district court's analysis, constitutes a matter of personal interest. But her allegation that the Commissioners were violating the Cleveland charter with an intent to deny African-American female employees the opportunities for promotions, if true, arguably could affect many other employees and therefore touch upon matters of public concern. *Id.* at 812 ("[A]lthough aspects of Plaintiff's speech involve matters of personal interest where he is speaking regarding a personal grievance as an employee, his speech also involves matters of public interest such that Plaintiff is speaking as a concerned citizen."); *Perry v. McGinnis*, 209 F.3d 597, 606 (6th Cir. 2000) ("Because Perry's speech served to ensure that the [state agency] was operating in accordance with the law . . . , it concerns the most public of matters.").

If we were to decide that either of Farmer's speech incidents was entitled to First Amendment protection, we would proceed to engage in the *Pickering* balancing test and

weigh Farmer's free speech interests against the defendants' interests as an employer. But the record before us would make it difficult, if not impossible, to perform this inquiry, because neither Farmer nor the defendants have articulated their competing interests. Rather than hypothesizing about what their respective interests might be, we will assume, without deciding, that Farmer engaged in constitutionally protected activity when she filed her Civil Service Commission grievance. This assumption does not prejudice either party because, as the subsequent discussion indicates, Farmer has failed to establish a prima facie case of First Amendment retaliation. *See Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 144 (6th Cir. 1997) (assuming that the plaintiff's speech was entitled to constitutional protection, because the resolution of the case depended upon whether her speech was a "substantial" or "motivating" factor in her employer's decision to terminate her employment).

As noted above, the second element in a claim of First Amendment retaliation requires the plaintiff to establish "that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that [constitutionally protected] activity." *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998). The adverse actions identified by Farmer involve the reduction in her job responsibilities. In discussing Farmer's retaliation claim, the district court noted that these alterations "reduced her from a supervisor-level employee engaged in management, policy making[,] and oversight of personnel to an employee who engages merely in clerical and training tasks." We believe that these changes in her duties constituted injuries that would dissuade an ordinary person from continuing to engage in speech regarding the alleged violations of the Cleveland charter or anti-discrimination legislation. *Smith v. Fruin*, 28 F.3d 646, 649 n.3 (7th Cir. 1994) (recognizing that "even minor forms of retaliation can support a First Amendment claim, for they may have just as much of a chilling effect on speech as more drastic measures").