**Rose O. HOWARD, Plaintiff–Appellant,**

v.

**BOARD OF EDUCATION OF THE MEMPHIS CITY SCHOOLS Defendant–Appellee.**

**No. 01–6433.**

United States Court of Appeals, Sixth Circuit.

July 1, 2003.

---

Before MOORE and ROGERS, Circuit Judges, and KATZ, District Judge.[*]

KATZ, District Judge.

Pro se Plaintiff–Appellant Rose O. Howard ("Appellant" or "Howard"), African–American, alleges that Defendant–Appellee Board of Education of the Memphis City Schools ("Appellee" or "Board") discriminated against her based on race and retaliated against her for filing charges of discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* On appeal, Howard argues that the district court erred by granting judgment as a matter of law to Appellee at the close of Howard's presentation of evidence. Howard also asserts that the district court denied her a fair trial by disqualifying her counsel, quashing certain subpoenas, denying her meaningful participation in a pre-trial conference, and allowing witnesses to testify out of order.

For the reasons set forth herein, we REVERSE the district court's grant of judgment as a matter of law on Howard's retaliation claims and REMAND for further trial proceedings. We AFFIRM the remaining rulings of the district court.

## I. BACKGROUND

This matter arises from Howard's Title VII complaint asserting that Appellee Board, by and through White Station Middle School ("WSMS") principal Harold Russell ("Russell") and others, discriminated against Howard based upon her race, created a race-based hostile work environment, and subjected Howard to retaliation for having filed internal complaints as well as a discrimination charge with the Equal Employment Opportunity Commission ("EEOC").

Russell became principal at the beginning of the WSMS 1993–1994 school year. At the end of that school year, Russell informed a Caucasian WSMS teacher, Tonja Kenemer, that he was going to move her from a portable classroom into Howard's classroom in the main school building. Appellant protested this classroom change, argued against the move first on the basis of seniority, then on her alleged claustrophobia,[1] and ultimately was given the option of either teaching in a portable facility or instead teaching as a floater.[2] Howard asserts that this reassignment was race-based and constitutes an adverse employment action.

As further evidence of discrimination and retaliation, Appellant cites numerous other incidents, including: (1) reprimands for her refusal to actively participate in an advisor/advisee program and her failure to place academic events on the middle school planning calendar; (2) assignment to teach

---

[*] The Honorable David A. Katz, United States District Judge for the Northern District of Ohio, sitting by designation.

1. Howard never produced a doctor's note or other diagnosis of claustrophobia to support her alleged condition.

2. Teachers who "floated" were not permanently assigned to a classroom and taught in various areas of the school that were unused at different times during the day.

in the cafeteria without supplies or a cart to transfer supplies; and (3) intentional mishandling of her applications for administrative positions. Appellant also complains that Russell fixed the outcome of an election in which she participated as a potential teacher representative. An African–American male ultimately prevailed in the election, but Appellant cites the event as evidence of discrimination. Further incidents eventually led to Howard's transfer, upon Russell's request, to Havenview Middle School.[3]

The trial testimony and record exhibits are confusing, and at times contradictory, regarding the precise sequence of events. However, the following is the clearest chronological representation that can be gleaned from the record:

November 1992

- Upon parental complaint, a white student is excused from completing a research assignment on Martin Luther King and Malcolm X.[4] Howard asks whether her child could similarly be excepted from a report on *To Kill a Mockingbird*. Russell purportedly replies that "Black parents can't do what White parents can do."

Fall 1993

- Russell becomes principal at WSMS.[5]

October 1993

- Prompted by a student complaint, Russell counsels Howard regarding the manner in which she addresses her students. Howard asserts that the scenario was a conspiracy in which the student audiotaped classroom proceed-

ings, which Russell then transcribed and unfavorably edited.
- Howard files a statement with Memphis Educational Association ("MEA") regarding the foregoing incident.
- Around this time, although not clear as to whether before or after Howard filed the MEA statement. Russell informs Howard that she will no longer be sent to attend a teacher workshop in Colorado.

April 1994

- Russell apparently chastises Black teachers for not attending a luncheon sponsored by Partners In Education ("PIE"). a parent-teacher organization. The teachers who boycott the luncheon apparently do so based on comments made by PIE president that the only way to motivate African–Americans to "get out" is to feed them. Russell apparently states that he does not regard the comment as offensive, which in turn upsets several faculty members.

August 1994

- Russell moves Kenemer, a female Caucasian teacher, from a portable classroom into Howard's classroom in the main school building. Howard ends up "floating" and eventually is required to teach a class in school cafeteria under less than ideal conditions and allegedly without adequate supplies.

September 1994

- Howard applies for assistant principal position at Overton High School. Does not obtain this position, or others

---

3. Other events include Howard's refusal to communicate with her team leader by any method other than written memorandum, refusal to attend required in-service meetings, and refusal to attend meetings with Russell and Ricks Mason, Director of Personnel Services.

4. Howard also reports this event as having transpired in February 1993. *See* Pl.'s Trial Ex. 5

5. Trial testimony indicates that Russell may have been at WSMS in 1992.

for which she applies, and asserts that her applications were intentionally mishandled to deprive her promotional opportunities in retaliation for prior events.

- Howard files 22–page complaint with Ricks Mason, WSMS Director of Personnel Services.

October 1994

- Russell yells at Howard in a faculty meeting allegedly merely for chiming in with her agreement as to an inflammatory statement made by Caucasian teacher, who is not reprimanded for the statement.
- Russell allegedly "fixes" election results to deny Howard a position as a teacher representative. Howard contends that she received the greatest number of votes; however, Howard testified at trial that she refused Russell's offer to allow her to inspect and count the ballots. The record also contains correspondence in which Howard acknowledges that election voting results likely were reported correctly, but she nonetheless complains about the manner in which the election was run and the lack of notice to voters regarding the manner by which election results would be determined, *e.g.*, plurality, simple majority, *etc.*

November 1994

- Russell purportedly falsifies attendance records to justify docking Howard's pay for an unexcused absence. However, Howard admitted that she did not comply with notification procedures and that Russell was technically justified in docking her pay.
- Howard files internal complaint against Memphis City Schools and Russell.

January 1995

- Russell reprimands Howard for not recording events on academic calendar.
- Howard files another internal complaint against Memphis City Schools and Russell.
- Howard files with EEOC alleging race-based discrimination.

April—July 1995

- Howard applies for various administrative positions within Memphis City Schools system.

August 1995

- Howard transferred from WSMS to Havenview, allegedly in retaliation for her complaints at WSMS.

Spring 1997

- Howard transferred without prior notice to Manassas, allegedly in retaliation for her complaints at WSMS.

January 1998

- Howard amends her EEOC complaint to include retaliation.
- While at Manassas, Howard receives a pin commemorating 20 years of service to the school system. However, a slip of paper accompanying the pin states that the pin commemorates Howard's service as a "custodial helper" instead of as a teacher. Howard asserts that this is yet another act of retaliation.

December 1999

- Howard takes medical leave from teaching at Manassas. Does not return to teaching until December 2000.

March 2000

- Howard's medical leave set to expire. Howard receives letter indicating potential consequences, including termination or constructive resignation, if she does not return to teaching upon expiration of her medical leave.
- The Board terminates Howard because it regards Howard as having

abandoned her job after she does not return to her position at Manassas High School upon expiration of her medical leave. Howard's former counsel Sandra Isom, ultimately disqualified from representation due to conflicting roles as counsel and adverse witness, testified at trial that Howard told her that she wanted to remain on leave during the pendency of the civil litigation. Based on that representation and the March 2000 letter. Howard's counsel, in conjunction with defense counsel, arrange a period of unpaid miscellaneous leave for Howard and the Board agrees to rescind Howard's termination.

April 2000

- Claire Reno and Sandra Isom move to withdraw as Howard's counsel. The district court denies the motion.

March—October 2000

- Howard remains on unpaid miscellaneous leave. Howard asserts that the leave was contrary to her wishes. Howard cites the event as an act of retaliation.

September 2000

- Unbeknownst to counsel, Howard sends Appellee a letter inquiring about her teaching assignment for the 2000–01 school year. Howard asserts that at most, the miscellaneous leave should have encompassed only the remainder of the 1999–2000 school year, and asserts that the extension of the leave into the 2000–01 school year was an act of discrimination and retaliation.

October 2000

- Isom and Reno renew their motion for leave to withdraw as Plaintiff's counsel. Isom and Reno later withdraw the motion.

December 2000

- Howard begins teaching at Melrose. Before accepting assignment at Melrose, Howard apparently is offered and rejects other positions, and also is offered positions at schools that have already filled their vacancy.

May 2001

- Defendant files motion to disqualify plaintiff's counsel. Court grants motion and gives Howard 20 days to either obtain counsel or alternatively notify court of intent to proceed pro se.

June 2001

- Howard notifies court of reluctant intent to proceed pro se, after which court instructs Howard that trial subpoenas are to be served in a timely fashion.

Trial commenced on October 16, 2001. Prior to trial, the court quashed certain subpoenas on the basis that they were untimely filed and not accompanied by witness attendance fees. The district court further indicated that certain parties subpoenaed would provide irrelevant testimony. After the close of Howard's evidence, the district court granted Appellee's Rule 50 motion for judgment as a matter of law. The district court proffered various reasons for its ruling, such as lack of evidence of racial animus as to most of the events complained of by Howard. The district court further noted that none of the events were properly regarded as an adverse employment action under Title VII.

On appeal, Howard complains that the district court improperly considered each event in isolation, as opposed to viewing the entirety of events as a whole. Howard also generally complains that she was denied a fair trial due to, *inter alia*, the disqualification of counsel, quashed subpoenas, and witnesses testifying out of order.

## II. DISCUSSION

### A. Denial of Fair Trial

■ Several months before trial, the district court disqualified both of Howard's attorneys, Sandra Isom and Claire Reno, on the basis that the Board had indicated it would call Howard's counsel as witnesses to testify as to the reasons why Howard was placed on unpaid miscellaneous leave. Howard complains that the disqualification denied her Seventh Amendment right to a fair trial. We review the matter of disqualification of counsel for an abuse of discretion. *Starcher v. Corr. Med. Sys., Inc.*, 7 Fed.Appx. 459 (6th Cir.2001) (citing *United States v. Mays*, 69 F.3d 116, 121 (6th Cir.1995)).

Disciplinary Rule 5–102(B) of Tennessee's Code of Professional Responsibility and Tennessee Supreme Court Rule 8 provide: "If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that the lawyer or a lawyer in the lawyer's firm may be called as a witness other than on behalf of the client, the lawyer may continue the representation until it is apparent that the testimony is or may be prejudicial to the client." In interpreting this rule, the Tennessee Court of Appeals has noted:

> While the Code does not prohibit absolutely an attorney to testify at a trial where he is also serving as an advocate, such practice should only be permitted under the most exceptional circumstances. Normally, this decision lies within the discretion of the trial judge. *State v. Webster*, 688 S.W.2d 460, 463 (Tenn.Crim.App.1984). When faced with this issue, however, the trial judge and the attorney should resolve any doubts "in favor of the lawyer testifying and against his becoming or continuing as an advocate." EC 5–10.

*Whalley Dev. Corp. v. First Citizens Bancshares, Inc.*, 834 S.W.2d 328, 331 (Tenn.Ct. App.1992).

In its motion to disqualify, Appellee stated its intention to call Isom and Reno as witnesses at trial regarding Howard's instructions to them concerning placement on leave. Reno and Isom were to provide testimony that contradicts Howard's assertions regarding why she did not return to work after expiration of her medical leave. It was therefore "obvious" that counsel would be called to testify on defendant's behalf and "apparent that the testimony [would] be prejudicial to" Mrs. Howard. We therefore find that the district court did not abuse its discretion in disqualifying Appellant's counsel.

Howard nonetheless contends that the disqualification abrogated her Seventh Amendment right to a fair trial. We note first that there is no constitutional right to counsel in civil proceedings. *Brown v. City of Detroit*, 47 Fed.Appx. 339 (6th Cir. 2002). Moreover, the district court afforded Howard ample opportunity to retain alternate counsel. She apparently was unable to do so and elected to proceed pro se.

Howard also appears to assert that she was prejudiced by conduct of her attorneys prior to disqualification. As to that matter, the Court recently explained:

> [T]he argument that her trial counsel provided incompetent legal representation lacks merit because it is well-settled that there is no constitutional or statutory right to effective assistance of counsel in a civil case. *See, e.g., Friedman v. Arizona*, 912 F.2d 328, 333 (9th Cir. 1990); *Glick v. Henderson*, 855 F.2d 536, 541 (8th Cir.1988). Thus, litigants in a civil proceeding may not attack an adverse judgment on this basis. *Friedman*, 912 F.2d at 333. Instead, the appropriate remedy is a malpractice action against the attorney. *Glick*, 855

F.2d at 541. *McMahon v. Rebound Care,* 54 Fed.Appx. 187 (6ᵗʰ Cir.2002).

Howard further complains as to the quashed subpoenas, events at a pre-trial conference, and the district court's decision to allow Russell to sit at the defense table with counsel. Upon review of the record, we find no impairment of Howard's Seventh Amendment rights.

**B. Order of Witness Testimony**

Howard complains that two witnesses were allowed to testify out of order. One witness was scheduled to enter the hospital for cancer treatment. The other, Sandra Isom, had out of state commitments relating to an ongoing case and was limited on outbound flights due to the repercussions of the September 11, 2001 tragedy.

■ "A district judge has considerable discretion in the conduct of a trial." *Boyle v. Revici,* 961 F.2d 1060, 1063 (8ᵗʰ Cir.1992) (finding no abuse of discretion in permitting witnesses to testify out of order). Federal Rule of Evidence 611(a) specifically provides that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence." Often "[t]he convenience of the jurors, the court, and the witnesses may all be best served by receiving ... testimony 'out of order' in certain circumstances." *United States v. Bailey,* 444 U.S. 394, 413, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980). In the instant action, the district court clearly put the jurors on notice that certain witnesses would testify out of sequence, and under the particular facts, we find no error attributable to permitting the witnesses to testify out of order.

**C. Judgment as a Matter of Law**

**1. Standard of review**

"In reviewing a motion for a judgment as a matter of law under Federal Rule of Civil Procedure 50, this Court applies the same standard that the district court uses." *Vance v. Spencer County Pub. Sch. Dist.,* 231 F.3d 253, 258 (6ᵗʰ Cir.2000). We therefore consider " 'the evidence in a light most favorable to the party against whom the motion is made, giving that party the benefit of all reasonable inferences.' " *Id.* (quoting *Tuck v. HCA Health Servs., Inc.,* 7 F.3d 465, 469 (6ᵗʰ Cir.1993)). The Court does not " 'weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury; rather, it must view the evidence in the light most favorable to the party against whom the motion is made, and give that party the benefit of all reasonable inferences.' " *Id.* (citation omitted). "Judgment as a matter of law is appropriate only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party." *Moore v. Kuka Welding Sys.,* 171 F.3d 1073, 1078 (6ᵗʰ Cir.1999).

**2. Racial Discrimination**

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). To prevail in an employment discrimination claim brought pursuant to Title VII, a plaintiff must either provide direct evidence of discrimination, or establish a *prima facie* case pursuant to the burden shifting paradigm set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Policastro v. Northwest Airlines, Inc.,* 297 F.3d 535, 538 (6ᵗʰ Cir. 2002). In the instant action, Howard presented no direct evidence of discrimination; therefore, the analysis proceeds under the *McDonnell Douglas* paradigm.

To establish a *prima facie* case of discrimination under Title VII, a plaintiff generally must show, by a preponderance of the evidence: (1) membership in the protected class; (2) an adverse employment action; (3) that she was qualified for the position; and (4) that she "was replaced by someone outside the protected class or was treated differently from similarly situated members of the unprotected class." *Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 728–29 (6th Cir.1999).

■ Factors one and three are not seriously disputed in this case. However, Howard's discrimination claims fail on the second and fourth factors. First, the Court finds no adverse employment action.

[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir.1999).

During her direct examination testimony, Howard submitted the following incidents as evidence of discrimination: (1) Russell's handling of the October 1993 student complaint; (2) Russell's comments regarding his opinion that the PIE president's comment was not offensive and subsequent handling of the event; (3) Russell retracting his offer to send Howard to the Colorado teachers' conference; (4) the transfer from her classroom; (5) Russell's increased scrutiny of Howard; (6) Russell's refusal to provide a cart or bag to Howard to transfer her supplies while teaching in the cafeteria; (7) Russell's comments made in relation to the Malcolm X assignment; (8) the alleged rigging of the teacher representative election;[6] and (9) Russell's reprimands of Howard for repeating a comment made by a Caucasian teacher who was not reprimanded and for not recording events on the academic calendar. Other incidents are referred to during the course of trial testimony, but Howard submits these occurrences as evidence of retaliation, not discrimination, and thus we do not consider those incidents here.

Even assuming that each of the foregoing events transpired as recounted by Howard and were adequately established through evidence at trial, we find that none of the foregoing incidents constitute an adverse employment action. The racially insensitive comments may have been offensive, but do not rise to the level of actionable conduct under Title VII. *See Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (admonishing that Title VII should not be expanded into a "general civility code"). The remaining incidents, particularly the reassignment from her classroom, most assuredly were inconvenient and disruptive to Howard. However, we do not find that the incidents, individually or collectively, rise to the level of conduct actionable as discrimination under Title VII.

■ We further note that most of the incidents do not establish discrimination for yet another reason, *i.e.*, Howard failed to adduce evidence at trial establishing that she was treated differently from simi-

6. Howard presented no evidence at trial supporting her contention that Russell rigged the election.

larly situated non-minority employees. *See Perry v. McGinnis,* 209 F.3d 597, 601 (6th Cir.2000). With respect to transfers to portables and assignments to teach in the library or cafeteria, it appears from the record that both Caucasian and Black teachers were required to work in portables, teach in the cafeteria, and act as floaters. The only situation in which a similarly situated nonminority employee was established as being was treated differently concerns Howard being chastised for repeating a comment made by a Caucasian employee, while the Caucasian employee remained unchastised. However, unless the reprimand "accompanied some other action, such as a demotion or salary reduction, it is not an adverse employment action." *Jones v. Butler Metro. Hous. Auth.,* 40 Fed.Appx. 131 (6th Cir.2002) (citing *Krause v. City Of LaCrosse,* 246 F.3d 995, 1000 (7th Cir.2001)); *Kocsis v. Multi–Care Mgmt.,* 97 F.3d 876, 882–83 (6th Cir. 1996). And while Howard was indeed replaced in her classroom by a Caucasian teacher, we agree with the district court that this transfer does not constitute an adverse employment action.

For these reasons, we affirm the ruling for judgment as a matter of law on Howard's claim of discrimination.

### 3. Hostile Work Environment

■ Howard asserts that the incidents set forth are evidence not only of racial discrimination, but also of a race-based hostile work environment.

An employee asserting a violation of Title VII based upon a hostile work environment must establish that (1) she was a member of a protected group, (2) she was subjected to unwelcome harassment, (3) the harassment was based upon the employee's protected status, such as race or gender, (4) the harassment affected a term, condition, or privilege of employment, and (5) the defendant knew or should have known about the harassing conduct but failed to take any corrective or preventive actions. *Williams v. Gen. Motors Corp.,* 187 F.3d 553, 560–61 (6th Cir.1999) (discussing the requirements for proving a hostile work environment claim based upon gender); *Moore v. KUKA Welding Sys. & Robot. Corp.,* 171 F.3d 1073, 1078–79 (6th Cir. 1999) (setting forth the elements of a prima facie case for a claim of a hostile work environment based upon race). *Farmer v. Cleveland Pub. Power,* 295 F.3d 593, 604–05 (6th Cir.2002).[7]

To prevail on her hostile work environment claim, Howard must establish that

**7.** The fifth prong of the test, which formerly required a showing that "the supervisor's harassing actions were foreseeable or fell within his or her scope of employment, and the employer failed to respond adequately and effectively," *Williams,* 187 F.3d at 560–61, is now assessed in light of *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). As set forth in *Ellerth:*

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence.... The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. [* * *] No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257.

her workplace was "permeated with discriminatory intimidation, ridicule, and insult[ ] that is sufficiently severe or pervasive to alter the conditions of ... [her] employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal citation and quotation omitted). "In determining whether an actionable hostile work environment claim exists, we look to 'all the circumstances,' including 'the frequency of the discriminatory conduct: its severity; whether it is physically threatening or humiliating, or a mere offensive utterance: and whether it unreasonably interferes with an employee's work performance.'" *Amtrak v. Morgan*, 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (citation omitted). The environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *See id.* at 788, 118 S.Ct. 2275. Conduct that is "merely offensive" is insufficient to support a hostile work environment claim. *Harris*, 510 U.S. at 21, 114 S.Ct. 367.

Our prior decisions instruct that we are to distinguish between harassment and harassment that is based on a plaintiff's protected status. Therefore, only those incidents that occurred because of Howard's race are properly considered in the context of her hostile work environment claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784 (6th Cir.2000); *Hopes v. Cleveland*, No. 97–3595, 1998 U.S.App. LEXIS 29572, at *13–14, 168 F.3d 490 (6th Cir. Nov. 16, 1998). The district court found that of the evidence presented at trial, only two incidents might be deemed racially hostile, *i.e.*, Russell's handling of the PIE appreciation luncheon, and Russell's comments made in relation to the Malcolm X book report. We find that it is also appropriate to consider the testimony regarding what other teachers viewed as increased racial tensions upon Russell's arrival at WSMS, as well as the assertion that Russell was not as congenial to Black teachers. Though Howard sets forth a litany of other events that she regards as contributing to creation of a hostile work environment, not all of those incidents are properly considered for the reasons stated above.[8]

Ultimately, based on the foregoing incidents, we do not regard Howard's work environment as permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of her employment. Nor do we find that any of the complained of conduct constitutes a "tangible employment action" as set forth in *Morris*. *See Morris*, 201 F.3d at 789 (noting that the Supreme Court has defined a tangible employment

---

8. We make clear that "even though a certain action may not have been specifically racial in nature, it may contribute to the plaintiff's proof of a hostile work environment if it would not have occurred but for the fact that the plaintiff was African American." *Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999). However, Howard presented no evidence that the incidents complained of would not have occurred but for her race. To the contrary, both Black and Caucasian teacher were assigned to portables and were required to float. As discussed further *infra*, although some of the incidents are not properly considered in the context of Howard's hostile work environment claim, they might be actionable as retaliatory harassment. *See Mast v. IMCO Recycling of Ohio, Inc.*, 58 Fed.Appx. 116 (6th Cir. Feb. 3, 2003) (explaining that harassing conduct may not be aggregated if it is attributed to separate and distinct motives) (citing *Morris*, 201 F.3d at 790–91).

action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"). Accordingly, we affirm the district court's ruling as to the hostile work environment claim.

### 4. Retaliation

■ Although we agree with the district court that Howard failed to adduce sufficient evidence at trial to support a claim for racial discrimination or hostile work environment, we find that the matter of retaliation should have been submitted to the jury.

Title VII provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title.

42 U.S.C. § 2000e–3(a). In order to establish a prima facie case of retaliation under Title VII. Howard must prove that:

(1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris*, 201 F.3d at 792 (6th Cir.2000).

Howard's primary contentions, other than those set forth above, in support of her retaliation claim are that she was transferred from her classroom, subjected to continued scrutiny and monitoring by Russell, sabotaged in her efforts to obtain an administrative position, transferred to several different schools, and given a service pin commemorating her service as a custodial helper. While many of these incidents do not rise to the level of an adverse employment action, the incidents, in toto, might arguably give rise to actionable retaliatory harassment. After viewing all of the conduct transpiring after the occurrence of Howard's first protected activity, *i.e.*, the MEA statement Howard filed regarding Russell's handling of the student complaint, we find that there was sufficient evidence submitted at trial, via testimony and trial exhibits, to submit to the jury as to the retaliation claim. It is clear that Howard engaged in a series of activities protected by Title VII. Howard asserts, and Appellees do not contest, that Appellees knew of Howard's exercise of protected rights. A number of actions were taken thereafter that might be regarded as amounting to an adverse employment action against Howard and/or retaliatory harassment by a supervisor.[9] Lastly,

**9.** Although we make no definite determination, we note that the jury might have reasonably found that a series of successive transfers to different schools within a period of a few years constitutes an adverse employment action. Factors indicating an adverse employment action include " 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.' " *Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir.1996); *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir.1999). Though our jurisprudence regarding "other indices" is sparse, we note that this might be an instance in which the "other indices" could reasonably result in a finding of an adverse employment action. Moreover, con-

there is evidence in the record supporting a causal connection between the conduct complained of and the protected activities.[10] Based on the foregoing, we reverse the district court's ruling as to retaliation and remand for further proceedings not inconsistent with this opinion.

### III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of judgment as a matter of law on Howard's retaliation claims and REMAND for further trial proceedings. We AFFIRM the remaining rulings of the district court.

JOHN M. ROGERS, Circuit Judge, dissenting.

ROGERS, Circuit Judge.

I concur in the majority's opinion, except that I respectfully dissent from the portion finding that Howard stated an actionable claim for retaliatory harassment.

The principal issues here are whether the Memphis City Schools ("Schools"). Howard's employer, took adverse employment action against Howard after she filed her complaints, and whether Russell, her supervisor, subjected her to severe or pervasive retaliatory harassment because she had complained. See Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir.2000). The majority finds that the evidence Howard adduced did not amount to a hostile work environment, but it finds differently regarding retaliatory harassment because Howard alleges additional

evidence for this claim: the Schools presented her with a note commemorating her service as a "custodial helper"; the Schools transferred her to different schools on two occasions; the Schools sabotaged her efforts to obtain an administrative position; Russell transferred from her main building classroom into a portable classroom; and Russell scrutinized her activities and monitored her closely after she had made her complaints.

Regarding the Schools' actions, it is clear that the "custodial helper" comment does not constitute a "materially" adverse employment action. See Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir.1999) (noting that "a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience"). Similarly, it is well-established that transfers without anything more do not constitute adverse employment actions. In Kocsis v. Multi-Care Management Inc., 97 F.3d 876 (6th Cir. 1996), for example, we noted that reassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions. Id. at 885–86. In the present case, Howard was transferred twice, first from WSMS to Havenview Middle School, and then–two years later–to Manassas High School.[1] It is undisputed that her salary, benefits, title, and work hours remained the same in both of these transfers, and she was able to keep teaching in her area of specialty, English. Howard concedes that she has

sidering the totality of circumstances, the sequence of events culminating in Howard's successive transfers might properly be regarded as retaliatory harassment.

10. For example, Russell admits that he canceled Howard's participation in the Colorado teachers' conference due to Howard taking "an adversarial position," which Russell defined as the filing of an MEA complaint.

1. The Schools also transferred her in 2000, when she requested–after the 2000–2001 school year had begun–to be taken off unpaid miscellaneous leave. But Howard presented no evidence of this transfer at trial, so I will not consider it here. Even if it were under consideration, it would not change the result.

no complaints about physical conditions at Havenview, which is a school reserved for advanced students, and though she testified that conditions at Manassas were not as good, she alleged no unusual hardship about the position.[2] In my view the series of transfers was not a sufficient basis for a jury to find an adverse employment action.

There was also insufficient evidence that Howard was wrongly prevented from obtaining an assistant principal job. Such a step by defendants would indeed constitute an adverse employment action. *See Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 410 (6th Cir.1999) ("For purposes of Title VII, a failure to promote is an adverse employment action."). But Howard failed to bring forward any evidence that the Schools had any part in her failure to obtain a position. The record indicates that the Schools' responsibility is to receive resumes and circulate them to the various principals, and then it is up to individual principals to choose whether to interview or hire any given candidate. Howard introduced evidence that she was qualified for a position, that she sent out over 35 applications for positions within the Schools, that she was interviewed for three of the positions that she applied for, that she was hired for none of these positions, and that one of the schools she interviewed with never sent her a rejection letter. But in light of the Schools' limited role in the hiring process, the only thing it could be held responsible for is not circulating Howard's resume. That Howard was in fact interviewed is evidence that the Schools did in fact circulate her resume. Consequently, to find that the Schools saw to it that Howard was denied a position, the jury would have to speculate that either the Schools either sabotaged the other resumes she sent out, or the Schools somehow saw to it that the individual principals decided not to hire Howard. There is not sufficient evidence in the record to support such a conclusion.

Next, there are the incidents involving Russell. To establish that Russell's conduct constituted severe or pervasive retaliatory harassment, Howard must show that "the workplace is permeated with discrimination, intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment[.]" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *see also Morris*, 201 F.3d at 790. Relevant factors "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367; *see also Morris*, 201 F.3d at 790 (citing this passage). Russell transferred Howard from her main building classroom into a portable classroom. Even assuming that Russell did this for purely retaliatory reasons, there was no evidence that the portable classrooms were anything more than distasteful, and anyway Russell–when Howard made it clear to him that a portable would for her be intolerable–gave Howard the option of staying in the main building by becoming a "floater." Russell also was said to have scrutinized her activities and monitored her closely after she had made her complaints. Again, assuming that Russell did this in retaliation, the evidence Howard submitted was simply that Russell was unfriendly towards her

2. Additionally, the Schools had a good reason to transfer her from Havenview: she had taught ninth-grade English at Havenview, and when Havenview eliminated its ninth-grade class and sent the students to a different school, Howard and other ninth-grade teachers at Havenview were also sent elsewhere.

and treated her with suspicion. Neither of these actions amounts to "severe or pervasive retaliatory harassment."

For these reasons, I respectfully dissent from the majority's finding that Howard stated an actionable claim for retaliatory harassment.