*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0354p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

OLIN CLAY, MARIE MOSS, MARCUS MILLER,
  *Plaintiffs-Appellants,*

  *v.*

  No. 05-4243

UNITED PARCEL SERVICE, INC.,
  *Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 04-01262—James Gwin, District Judge.

Argued: March 5, 2007

Decided and Filed: August 31, 2007

Before: BATCHELDER and MOORE, Circuit Judges; MILLS, District Judge.[*]

---

## COUNSEL

**ARGUED:** Dennis R. Thompson, THOMPSON & BISHOP, Akron, Ohio, for Appellants. Margaret M. Koesel, PORTER, WRIGHT, MORRIS & ARTHUR, Cleveland, Ohio, for Appellee. **ON BRIEF:** Dennis R. Thompson, Christy B. Bishop, THOMPSON & BISHOP, Akron, Ohio, for Appellants. Margaret M. Koesel, Tracey L. Turnbull, PORTER, WRIGHT, MORRIS & ARTHUR, Cleveland, Ohio, for Appellee.

  MOORE, J., delivered the opinion of the court, in which MILLS, D. J., joined. BATCHELDER, J. (pp. 20-22), delivered a separate opinion concurring in part and dissenting in part.

---

  [*]The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

1

—————————

**OPINION**

—————————

KAREN NELSON MOORE, Circuit Judge.  Plaintiffs-Appellants Marie Moss ("Moss"), Olin Clay ("Clay"), and Marcus Miller ("Miller")[1] (collectively "the plaintiffs") appeal the district court orders granting summary judgment to Defendant-Appellant United Parcel Service, Inc. ("UPS") on a variety of Title VII-based claims, and denying the plaintiffs' motion to reconsider. Moss appeals the grant of summary judgment on her disparate-treatment claim and hostile-work-environment claim.  Clay appeals the grant of summary judgment on his disparate-treatment claim and retaliation claim.  Miller appeals the grant of summary judgment on his disparate-treatment claim and retaliation claim.  Because the district court correctly applied the summary-judgment standard with respect to Moss's hostile-work-environment claim, Moss's disparate-treatment claim insofar as it pertains to the Akron position, and Miller's retaliation claim, we **AFFIRM** the district court's grant of summary judgment on these claims.  Because there are genuine issues of material fact with respect to Moss's disparate-treatment claim insofar as it pertains to the Middleburg Heights position, Clay's disparate-treatment claim, Clay's retaliation claim, and Miller's disparate-treatment claim, we **REVERSE** the district court's grant of summary judgment on these claims and we **REMAND** the case for further proceedings consistent with this opinion.

**I.  BACKGROUND**

All of the plaintiffs are African-American, have worked for UPS, and claim that UPS subjected them to adverse employment actions based on their race.  Beyond this, the similarities between these plaintiffs end, and the facts leading up to their claims are distinct.  Accordingly, the relevant facts for each plaintiff appear where appropriate below.

**II.  ANALYSIS**

**A.  Standard of Review**

We review de novo a district court's order granting summary judgment.  *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  Conversely, "[s]ummary judgment is inappropriate when the evidence raises a genuine issue about a material fact, 'that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Wright*, 455 F.3d at 706 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  We "view all evidence in the light most favorable to the nonmoving party."  *Id.*  Appellate jurisdiction is proper in this case pursuant to 28 U.S.C. § 1291.

**B.  Marie Moss**

With respect to Moss, the issues before us are whether the district court erred in granting summary judgment to UPS on Moss's disparate-treatment claim and whether the district court erred in granting summary judgment to UPS on Moss's hostile-work-environment claim.

—————————

[1] Before us is a motion by plaintiffs' counsel to dismiss Miller's appeal.  As Miller has not consented to the motion, and his appeal is fully briefed, we hereby deny the motion.

### 1. Facts

#### a. Customer-Counter-Clerk Position

At the UPS center located in Akron, Ohio there are two shifts: pre-load (the morning shift) and re-load (the evening shift). In pre-load, packages are shipped to the Akron center, where they are unloaded and placed on a conveyor belt for sorting ("Primary Sort"). From the Primary Sort, the main conveyor breaks off into two parallel, smaller conveyor belts known as the Metro Sort and the East Sort.

Moss has worked for UPS since 1976. From 1978 until 1993 (when the position was eliminated) Moss was a part-time, customer-counter clerk at the Akron center. Customer-counter clerks wait on customers and deal with the public. In 1993, Moss became a part-time, pre-load clerk, and worked at the East Sort, where she was the only black employee. As a pre-load clerk, Moss's duties included making address corrections, repairing damaged packages, repacking opened packages, retaping packages, and handling telephone inquiries. Moss was a member of the International Brotherhood of Teamsters, and was subject to a collective bargaining agreement ("CBA").

In 1999 or 2000, Moss learned that UPS was going to build another center in Wadsworth, Ohio. The CBA contained a "Change of Operations" ("COO") provision which under the circumstances of this case would allow employees from the Akron center to "follow their work" to Wadsworth. Joint Appendix ("J.A.") at 619, 624 (CBA at 106; Supp. to CBA at 148). In other words, if a position in Akron was transferred to Wadsworth, the person working in that position in Akron had the right to take the position in Wadsworth. Further, the COO provision provided that when a new center (in this case Wadsworth) opened, any part-time support jobs that were created within thirty days of the opening must be offered, by seniority, to existing part-time support employees from the affected center (in this case Akron).

Part-time job openings were filled using intent sheets. According to Moss, as a matter of practice, intent sheets were posted indefinitely until the position was filled and the employee actually began working in that position. Employees interested in the position signed the intent sheet, and the position went to the person with the greatest seniority.

In late 2000, intent sheets were posted in Akron for various part-time positions for the Wadsworth facility. Moss saw a posting for her current position (pre-load clerk) even though she had not first been offered the opportunity to follow her work as required by the CBA. She did not see an intent sheet for a customer-counter-clerk position. When Moss inquired about the customer-counter-clerk position, the Metro-Center Manager, Brian Bachiari, told her that UPS had posted and taken down the intent sheet in August 2000, and that the customer-counter-clerk position had been filled. Moss signed the intent sheet for her second choice of pre-load clerk.

Later, Moss learned that there were actually two open customer-counter-clerk positions available, but only one of those open positions had been posted at the Akron facility. The two positions were both given to white employees: one was given to a white male, Tom Gradwohl, from the Akron facility, the other to a white female, Margaret Ruddy ("Ruddy"), from the facility in Middleburg Heights, Ohio.

Moss filed a grievance with respect to the manner in which the customer-counter-clerk intent sheet had been posted, alleging that UPS failed to follow policy and the CBA. A grievance hearing was held, resulting in a deadlock decision. At the hearing, Moss made clear that if she could not get a customer-counter-clerk position in Wadsworth, she wanted the pre-load-clerk position in Wadsworth.

The next day, Human Resources Manager, Mike Mick ("Mick"), who had attended the grievance hearing, approached Moss with the Wadsworth pre-load-clerk intent sheet and said, "You wanted me to take your name off the pre-load clerk position." J.A. at 586 (Moss Aff. at ¶ 34). Mick told her to cross out her name and initial it. Moss took Mick to mean that UPS would give her the customer-counter-clerk position if she first took her name off the pre-load-clerk-intent sheet, and so she complied with his request. When Moss asked for the intent sheet for the customer-counter-clerk position, Mick informed her that the customer-counter-clerk position had already been filled, and then he walked away.

### b. Supervisor Joseph Terlop

The Wadsworth facility opened on February 2, 2001. On January 30, 2001, Moss's manager, Joseph Terlop ("Terlop"), approached Moss at the end of her shift and told her to report on Monday to the evening shift, because her current job had moved to Wadsworth. Moss did not want to work the evening shift, and so she informed Terlop that she was going to use her seniority to take a position in the Primary Sort to avoid the adverse shift transfer.

On February 2, 2001, Moss reported to work in the morning and was administered a Primary-Sort qualifying test which she passed. Instead of placing her on the Primary-Sort, however, Terlop assigned her to unload trailers. Moss filed another grievance. The next day and for the next several days, Terlop assigned Moss to load package cars, a task involving heavy lifting. Eventually, Moss was assigned to the Primary Sort, where she remained for approximately two weeks.

The work was too strenuous for Moss, and she requested reassignment to an open, small-sort position which was another position on the Primary-Sort for which she was qualified. The small-sort position involved smaller and lighter packages. Terlop refused. Instead, Terlop assigned Moss to the boxline charger position—a position for which she was not qualified, involving very heavy lifting. Despite the fact that Moss does not believe that she passed the qualifying test (she was never shown the results, even after asking for them), Terlop kept her in the boxline charger position. Moss injured her groin on the job and was unable to work for six months.

Moss alleges that Terlop constantly criticized Moss regarding matters for which he did not criticize her white co-workers. According to Moss, Terlop criticized her for eating during work, for leaving her work station to get a cup of coffee, for using the bathroom at the end of her break, and for the size of her earrings. Moss asserts that although white employees engaged in similar conduct, she never witnessed Terlop criticize those employees. Further, Terlop assigned Moss to tasks outside of her job description; for example, one time Terlop made Moss take company supplies, like toilet paper, over to the supply trailer. Terlop also falsely accused Moss of taking boxes while on company time. Moss also alleges that while she was on leave, someone cut the lock on her desk, removed the supplies, and placed them in a box, although a white co-worker was able to store his supplies in a locked desk drawer.

One day, as Moss was on her way out at the end of her shift, another co-worker asked for her assistance. While Moss was waiting for the co-worker, Moss began eating one of the doughnuts that someone had brought in for the employees. Terlop went up to Moss and, in front of other employees, accused her of standing around and eating instead of working.

Another incident between Moss and Terlop centered around the route Moss took to get to her work area. According to Moss, Terlop criticized her for the route she took, but did not chastise her white co-workers who took the same route. Terlop told Moss she was not getting to her work area on time, criticized the route she took, and had her timed to record how long it took her to get to her work station. Moss filed grievances claiming UPS's instructions about the route Moss should

take to walk to her work area constituted harassment, and alleging discrimination based on Terlop disciplining her for failing to report to her work area on time.

### c.  Procedural History

Moss filed suit against UPS, alleging race discrimination under 42 U.S.C. § 1981 and OHIO REV. CODE §§ 4112.02(A) and 4112.99. UPS filed a motion for summary judgment. The district court granted UPS's motion with respect to all of Moss's claims except for Moss's claim of disparate-treatment based on UPS's failure to give her the opportunity to follow her work as a pre-load clerk to the Wadsworth facility.[2] Moss then filed a motion to reconsider which the district court denied. On appeal, Moss argues that the district court erred in granting summary judgment on her other disparate-treatment theories and on her hostile-work-environment claim.

### 2.  Disparate-Treatment Claim

When, as is the case here, a plaintiff presents only indirect evidence of disparate treatment based on race, we analyze the claim under the *McDonnell Douglas* burden-shifting approach. *See Johnson v. Kroger Co.*, 319 F.3d 858, 865-66 (6th Cir. 2003). "'On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry.'" *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)).

First, the plaintiff must make a prima facie case of racial discrimination. *Johnson*, 319 F.3d at 866. There are many "context-dependent ways by which plaintiffs may establish a prima facie case." *Macy*, 484 F.3d at 365 (emphasis removed). "The key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Id.*

In this case, the parties all use the following construct for establishing whether or not Moss made a prima facie case: the plaintiff must demonstrate "that (1) he [or she] was a member of a protected class; (2) that he [or she] suffered an adverse employment action; (3) that he [or she] was qualified for the position; and (4) that a person outside the protected class was treated more favorably than him [or her]." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001). The fourth prong requires that the plaintiff show that the person treated more favorably was similarly situated to the plaintiff in all relevant respects. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610-11 (6th Cir. 2002).

Second, if the plaintiff makes a prima facie case, the burden shifts to the defendant to articulate a "legitimate, non-discriminatory reason" for the employment decision. *Braithwaite*, 258

---

[2] We pause here to make clear the basis for our jurisdiction. When our jurisdiction is based on 28 U.S.C. § 1291, the district court must first enter a final decision. 28 U.S.C. § 1291. Although the district court did not grant UPS summary judgment on Moss's disparate-treatment based on UPS's failure to give her the opportunity to follow her work as a pre-load clerk to the Wadsworth facility, the parties stipulated to dismiss this claim without prejudice, pursuant to Rule 41 of the Federal Rules of Civil Procedure. The district court approved the stipulated dismissal. Accordingly, the claim is not pending before the district court and does not affect the finality of the district court's judgment.

The plaintiffs had initially brought state-law discrimination claims in the district court under Ohio Revised Code §§ 4112.02 and 4112.99. In its order granting summary judgment in part to UPS, the district court explained that the elements of a prima facie case under the Ohio state discrimination statute are the same as under federal law; accordingly, the district court analyzed all of the plaintiffs' claims under the federal framework. We infer from this approach that when the district court dismissed the plaintiffs' federal claims, it also dismissed the plaintiffs' parallel state-law claims. On appeal, the plaintiffs fail to make any arguments with respect to their state-law claims.

F.3d at 493 (internal quotation marks omitted).  To meet this burden, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons" for its decision.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981).  "An articulation not admitted into evidence will not suffice.  Thus, the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel."  *Id*. at 256 n.9.

Finally, if the defendant meets its burden of articulation, the burden shifts back to the plaintiff to show that the reason put forth by the defendant is pretextual, which can be done "'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'"  *Johnson*, 319 F.3d at 866 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

Moss claims that the district court erred in granting summary judgment to UPS on her disparate-treatment claim.  In support of her position, Moss argues that she raised genuine issues of material fact as to whether UPS discriminated against her by not giving her one of the two customer-counter-clerk positions at the Wadsworth facility.[3]  UPS posted an intent sheet in Akron for only one of the customer-counter-clerk positions ("Akron position"), and did not post an intent sheet in Akron for the other customer-counter-clerk position which was eventually filled by a UPS employee from the Middleburg Heights facility ("Middleburg Heights position").  We examine each position separately below.

### a.  The Akron Position

The district court found that Moss had made her prima facie case with respect to the Akron position.  It further found that UPS had put forth a legitimate, non-discriminatory reason for denying her the position—as Moss has conceded, she did not sign the intent sheet that was posted in August 2000.  Moss asserted that UPS's reason was pretextual as was evidenced by the fact that the intent sheet was posted for only one week, and was posted six months before the position would be available, whereas by common practice, intent sheets were posted until about one or two weeks before a given position opened.

The district court rejected Moss's pretext argument, reasoning that UPS's failure to follow its usual posting procedure did not, in itself, create a material issue of fact from which a jury could infer that UPS was motivated by race in taking down the intent sheet.  The district court reasoned that because Moss did not present any evidence showing that UPS knew she was interested in the customer-counter-clerk position until *after* the intent sheet had been posted and the position filled, a jury could not infer that UPS took down the intent sheet to work a harm against Moss.

We agree.  As a matter of common sense, the only way that UPS's decision to take down the intent sheet could be evidence of racial discrimination is if UPS had reason to know that Moss was actually interested in the customer-counter-clerk position.  Moss has not cited anything in the record indicating that UPS was on notice that Moss was interested in the position until well after the intent sheet had been posted and the position had been filled.  Because Moss's theory of pretext is based solely on unsupported speculation that somehow UPS knew she wanted the customer-counter-clerk position, we conclude that the district court was correct in finding that Moss failed to establish evidence of pretext.  Accordingly, we affirm the district court insofar as it granted summary judgment to UPS on Moss's disparate-treatment claim based on the Akron position.

---

[3] In the district court, Moss also argued disparate-treatment with respect to the "Hazmat Responder Position" and "Small Sort Position."  Moss makes no arguments in this court with respect to these theories.  Accordingly, Moss has forfeited these claims on appeal.  *See Reed*, 167 F.3d at 993.

### b.  The Middleburg Heights Position

#### i.  Prima Facie Case

In its order denying Moss's motion to reconsider, the district court determined that Moss could not make a prima facie case with respect to the Middleburg Heights position because Moss and Ruddy were seeking two different positions.  According to the district court, the two customer-counter-clerk positions in Wadsworth were distinct, in that one was reserved for an Akron employee and one was reserved for a Middleburg Heights employee.  Because Moss was an Akron employee, the district court explained, she was seeking only the Akron position.  We interpret the district court's finding to mean that it did not consider Moss and Ruddy as similarly situated.  The district court provided no citation to the record in support of its factual findings.

We have found nothing in the record which establishes that the Middleburg Heights position was reserved for an employee from the Middleburg Heights facility.  UPS cites Mike Mick's ("Mick") Declaration and the intent sheet which was posted in Akron as evidence that the position filled by Ruddy was open only to Middleburg Heights employees.  But those documents do not establish that this was the case.  The Mick Declaration states that "UPS filled one position out of the Middleburg Heights hub and the other from the Akron facility."  J.A. at 125 (Mick Decl. at ¶ 13).  This explains only who eventually received these positions, but it does not establish that one of the positions was reserved for a Middleburg Heights employee.[4]

The intent sheet posted in Akron does have "Akron-Wadsworth" written on the top, but that does nothing to establish that only one customer-counter-clerk position was reserved for an Akron employee.  J.A. at 745.  Based on the lack of evidence indicating that Moss was not eligible for both customer-counter-clerk positions at Wadsworth, the district court erred in determining that Moss was not similarly situated to Ruddy.  As the parties concede that the other three elements of Moss's prima facie case are met, the burden shifts to UPS.

#### ii.  Legitimate, Nondiscriminatory Reason

UPS has not given any reason for giving the position to Ruddy (who had less seniority than Moss) other than its allegation that the position was not available to Akron employees.  This could constitute a legitimate, nondiscriminatory reason for not giving the position to Moss, *if* it was supported by admissible evidence.  *See Burdine*, 450 U.S. at 255-56.

As explained above, UPS's citations to the record do not "clearly set forth, through . . . admissible evidence, the reasons" why Moss was ineligible for the Middleburg Heights position.  The Mick Declaration merely states what did happen; the Akron intent sheet only establishes that UPS posted an intent sheet in Akron.  UPS has not cited any affidavits or other evidence that states that UPS intended to fill one customer-counter-clerk position from the Akron facility and one from the Middleburg Heights facility.  Because UPS has failed to meet its burden of articulation as set forth in *Burdine*, we reverse the judgment of the district court with respect to Moss's disparate-treatment claim based on the Middleburg Heights position.

---

[4] The dissent complains that we "discard[] Mick's declaration as inapposite . . . ."  Dissent at p. 20.  Our problem with the Mick declaration is that there is no nexus between any statement made in the Mick declaration and UPS's averred reason for why Moss was ineligible for the Middleburg Heights position.  Because both the district court and UPS relied on the theory of two different positions to exclude Ruddy as similarly situated, Moss produced sufficient evidence to meet her prima facie burden.  Thus, the burden of production shifted to UPS to articulate its legitimate, non-discriminatory reason, through the introduction of admissible evidence.  As we explain in this opinion, UPS has failed to meet its burden of production, because it has articulated a reason, but cited nothing in the record which supports that reason.

### 3. Hostile-Work-Environment Claim

Moss also claims that the district court erred in granting UPS summary judgment on her hostile-work-environment claim. The *McDonnell Douglas* burden-shifting approach also applies to hostile-work-environment claims. In this case, the parties agree that Moss's prima facie case is established if she shows that (1) she is a member of a protected class; (2) she was subjected to unwelcomed racial harassment; (3) the harassment was race based; (4) the harassment unreasonably interfered with her work performance by creating an environment that was intimidating, hostile, or offensive; and (5) employer liability. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).

The district court determined that Moss failed to establish a prima facie case for hostile-work environment because she did not demonstrate that the harassment she endured was based on race and she did not show that the harassment unreasonably interfered with her performance. In other words, she did not meet the third and fourth prongs of her prima facie case. We examine each of these prongs in turn.

### a. Whether the harassment was based on race

Moss does not allege that any racially derogatory comments were made in the workplace; her claim is based on the theory that the facially neutral conduct of her supervisor towards her was, in fact, based on her race. Conduct that is not explicitly race-based may be illegally race-based and properly considered in a hostile-work-environment analysis when it can be shown that but for the employee's race, she would not have been the object of harassment. *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 605 (6th Cir. 2002), *abrogated on other grounds by White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 240-41 (6th Cir. 2005).

Moss claims that Terlop singled her out and castigated her for engaging in behaviors in which her white counterparts engaged with impunity. In support of her argument that she was harassed based on her race, Moss supplied her own affidavit as well as affidavits from two co-workers. According to the district court, these affidavits were "speculat[ive]" and "lack[ed] sufficient detail," and failed to specify whether Terlop knew about the white employees' conduct. J.A. at 947-48 (Op. at 12-13). Therefore, the district court determined that the affidavits did not establish that the harassment was based on race.

The affidavits assert that Moss was criticized for conduct for which her white co-workers were not. Moss was criticized for the doughnut incident, for the route she took to get to her work station, for leaving her work station to get a cup of coffee, for using the bathroom at the end of her break, and for the size of her earrings. These affidavits set forth specific conduct for which Moss was berated and for which her white co-workers were not; thus, the district court erred in finding that these affidavits did not provide sufficient detail.

We also reject the district court's rejection of the affidavits as "speculat[ive]." J.A. at 947 (Op. at 12). A fair reading of at least one of the affidavits establishes that Terlop did witness white employees engaging in similar conduct for which he failed to discipline them. For example, in the affidavit of Moss's co-worker, Sue Starkey, Starkey states that Terlop yelled at Moss for the way she walked to her work station, "yet Terlop never mentioned anything to me about how I walked to or from my work area," even though Starkey often took the same route. J.A. at 603 (Starkey Aff. at ¶ 15). The Starkey Affidavit also states that sometime after the doughnut incident, "a white co-worker[] took an entire plate of food to eat while she was still on the clock, [and] Terlop said nothing." J.A. at 604 (Starkey Aff. at ¶ 18). The obvious and fair inference from these statements is that Terlop was in a position from which he could witness these events.

Given that Moss was the only black employee in her work area and that she alleges that Terlop disciplined her for things for which he did not discipline her co-workers, Moss has created

an inference, sufficient to survive summary judgment, that race was the motivating reason behind Terlop's behavior. Accordingly, the district court erred in finding otherwise.

### b. Severe or Pervasive

In order to satisfy the fourth prong of the prima facie case, the plaintiff must present evidence showing that under the "totality of the circumstances" the harassment was "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560, 562 (6th Cir. 1999) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)). The severe or pervasive requirement has both an objective and a subjective component. *Harris*, 510 U.S. at 21-22. It requires the court to examine, under the totality of the circumstances, "'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance.'" *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006) (alterations in original) (quoting *Harris*, 510 U.S. at 23).

Although the question of "[w]hether conduct is severe or pervasive is 'quintessentially a question of fact,'" *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006) (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)), we have earlier affirmed grants of summary judgment, determining that as a matter of law, the conduct complained of was not sufficiently severe or pervasive. *See, e.g.*, *Smith v. Leggett Wire Co.*, 220 F.3d 752, 760-61 (6th Cir. 2000); *Burnett v. Tyco Corp.*, 203 F.3d 980, 984-85 (6th Cir.), *cert. denied*, 531 U.S. 928 (2000).

The district court determined that the harassment complained of by Moss did not rise to the level of severity or pervasiveness that would unreasonably interfere with her ability to work. Recounting the incidents raised in the affidavits, totaling fifteen specific incidents spanning a two-year period, the district court found that these incidents were isolated and were not pervasive.

With respect to the severity of the incidents, the district court found the failure to remove her from the boxline charger position, the doughnut incident, and timing her route to her work station were the most egregious. Examining other cases in our circuit, the district court determined that "[c]ases of far more severe humiliation and ridicule have been held not to violate Title VII." J.A. at 949 (Op. at 14).

We agree. For the most part, the incidents complained of amounted to "mere offensive utterances," which are not actionable under Title VII. *See Harris*, 510 U.S. at 21. *Compare Jordan*, 464 F.3d at 598 (conduct was sufficiently severe or pervasive when for over ten years plaintiff was exposed to racial slurs, demeaning jokes, and inflammatory graffiti, experienced "isolation and segregation" and "disparate discipline and additional duties.") *with Burnett*, 203 F.3d at 984-85 (three sexually offensive remarks made by the plaintiff's supervisor at the beginning and end of a six-month period did not constitute pervasive discriminatory conduct).

We note that the failure to remove Moss from the boxline charger position did result in her groin injury which kept her out of work for six months. This is a serious matter. However, this incident, standing either alone or in conjunction with the alleged offensive utterances, does not constitute a hostile work environment. The Supreme Court recently explained that "[a] hostile work environment . . . typically comprises a succession of harassing acts, each of which 'may not be actionable on its own.' In addition, a hostile[-]work[-]environment claim 'cannot be said to occur on any particular day.'" *Ledbetter v. Goodyear Tire & Rubber Co.*, - - U.S. - -, 2007 WL 1528298 at *12 (2007) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002)). In a hostile-work-environment claim, "the actionable wrong is the environment, not the individual acts that, taken together, create the environment." *Id.*

In the case at bar, Terlop's refusal to remove Moss from the boxline charger position does not constitute the type of on-going harassment which would create a hostile work environment. Moss requested that she be removed from the position, and Terlop refused to do so. This is more akin to a discrete act, which is decidedly not actionable as a hostile-work-environment claim. *See id.* While we do not wish to diminish the gravity of the situation, this incident does not, as a matter of law, meet the severe or pervasive requirement for a hostile-work-environment claim.[5] Accordingly, we affirm the district court's grant of summary judgment to UPS on Moss's hostile-work-environment claim.

## C. Olin Clay

With respect to Clay, the issues before us are whether the district court erred in granting summary judgment to UPS on Clay's disparate-treatment claim, and whether the district court erred in granting summary judgment to UPS on Clay's retaliation claim.

### 1. Facts

At UPS, feeder drivers are typically long-distance drivers traveling to and from the major hubs at UPS to deliver and pick-up packages. Depending on seniority, feeder drivers typically work either on an on-call basis or have permanent runs. Feeder drivers first serve a probationary period consisting of working thirty-days in a ninety-day period, whereupon they become a full employee.

Clay worked for UPS at the Middleburg Heights hub facility from November 1999 until September 2001 as an on-call, feeder-truck driver. Clay's seniority date was November 15, 1999. UPS determined that Clay completed his probationary period around June 2000.

When UPS hired Clay, UPS told him that he would be "immediately qualified" at driving triples, which are large, triple-trailer, semi-trucks used for long hauls. J.A. at 564 (Clay Aff. at ¶¶ 11-12). Triples drivers make approximately one-dollar more per hour than the regular pay for feeder driving. The training process consisted of a triples-qualified supervisor riding with a feeder driver. In order to be eligible for triples training, one requirement was that the driver sign a bid sheet for a triples run.

On June 5, 2000, Clay had a confrontation with Joe Rudnicki, Feeder Driver Manager, who yelled at Clay for idling his truck. Rudnicki told Clay he was "going to wage war" on Clay. J.A. at 566 (Clay Aff. at ¶ 34). Clay alleges that after his hiring, UPS proceeded to provide triples training to the new drivers according to policy, but when Clay was next in line to receive training, without explanation, Rudnicki stopped providing the training. As a result, Clay continued to drive doubles for less money.

In August 2000, Clay filed a grievance with the union claiming he was unfairly denied triples training. Rudnicki confronted Clay about his grievance, stating, among other things, that failure to train Clay had been a mistake. Shortly, thereafter, and by the time a grievance hearing was held, Clay was provided with triples training.

On December 18, 2000, Clay filed discrimination charges with the EEOC/OCRC. From January 2001 through March 2001, Clay was not called in to work. Feeder drivers were typically laid off in the early part of the year at UPS, and Clay received unemployment compensation during this period. In April 2001, Clay was advised by a psychiatrist (he had begun seeking counseling for

---

[5] Moss also argues that the district court failed to examine the conduct under the totality of the circumstances. We disagree. In determining that the incidents were not severe or pervasive, the district court examined both the interplay between the different incidents alleged and also how these incidents occurred over a period of time.

work-related stress and depression) to stay off work. UPS listed Clay as "out of service" in the feeder logs and no one from UPS called him from April 2001 through June 2001. J.A. at 575 (Clay Aff. at ¶¶ 101-02).

On June 18 or 19, 2001, Clay received his right-to-sue letter from the EEOC. Around this same time, Clay informed union representative Reagan O'Connell that he wanted to be placed in service again. O'Connell advised Clay to get a work release from Clay's doctor and to send it to Rudnicki. Clay faxed a form to Rudnicki around July 27, 2001, indicating that he was cleared to return to work as of August 1, 2001.

In a letter dated July 27, 2001, UPS notified Clay that he "lacked current documentation" to justify his absence since the 2nd of January. J.A. at 576, 713 (Clay Aff. at ¶ 110; 7/27 Letter). UPS imposed a deadline of August 1, 2001, to submit "proper documentation" to justify his absence. J.A. at 713 (7/27 Letter). The letter was postmarked July 30, 2001, and Clay did not receive the letter until the August 1st deadline. At this point, Clay considered himself terminated.

Clay called the union and spoke with Union Business Representative Jack Kabeller, informing him of his termination and his desire to file a grievance. Kabeller told Clay to contact Tom Piscitello ("Piscitello"), the Division Manager for Middleburg Heights. When they spoke, Piscitello told Clay that his doctor's excuse was "no good" and that Clay had to submit additional medical details. J.A. at 577 (Clay Aff. at ¶¶ 116-17). On August 7, 2001, Clay contacted his doctors and requested that they fax his diagnosis directly to Piscitello. His doctors complied with Clay's request that same day.

On August 22 or 23, 2001, Clay received a certified letter from Rudnicki formally stating that Clay had been terminated for "unauthorized leave of absence." J.A. at 578 (Clay Aff. at ¶ 119). The union filed a grievance on Clay's behalf.

A local-level grievance hearing took place on September 19, 2001. At the hearing, Piscitello told Clay that he had to be cleared by a UPS-designated doctor before UPS would consider allowing him to return to work at UPS. Clay saw the company-approved doctor on September 21, 2001. The doctor told him that he would fax the information to UPS and that Clay could leave. The doctor never told Clay that he was cleared for work.

Clay went home after the doctor's appointment. He turned off his cell phone and plugged it into a wall socket to recharge the battery. On Wednesday, September 26, 2001, Clay turned on his cell phone and retrieved several messages from UPS dispatch. On October 1 or 2, 2001, Clay received a certified letter, dated September 26, 2001 and post-marked September 29, 2001, informing him that he had been fired and/or considered to have "voluntar[il]y quit" for missing three consecutive days pursuant to the CBA. J.A. at 580 (Clay Aff. at ¶¶ 134-35). However, Rudnicki has stated that Clay was not recorded as released to work until the afternoon of September 24, 2001. The first full day on which UPS considered Clay available to work was, therefore, September 25.

Clay filed suit against UPS, alleging hostile work environment, disparate treatment, and retaliation under 42 U.S.C. § 1981 and OHIO REV. CODE §§ 4112.02(A), 4112.99. UPS filed a motion for summary judgment. The district court granted UPS's motion with respect to all of Clay's claims. Clay then filed a motion to reconsider, which the district court denied. On appeal, Clay has abandoned his hostile-work-environment claim.

### 2.  Disparate-Treatment Claim

#### a.  Prima Facie Case

The district court analyzed three different allegations of disparate treatment, but on appeal Clay focuses only on UPS's failure to provide him with triples training. The district court found that Clay could not establish that he suffered an adverse employment action and that Clay could not establish that a person outside of the protected class was treated more favorably than he was. We disagree with the district court on both grounds, and conclude that Clay has set forth a prima facie case of discrimination.

#### i.  Adverse Employment Action

The district court, without citing any cases, stated that Clay failed to show that he suffered an adverse employment action, because eventually he received the triples training. Driving triples paid one dollar more per hour than the feeder-driving that Clay was assigned as a result of his inability to perform triples runs. Clay was never offered any compensation to make up for lost wages during the time that he was not trained to drive triples. We hold that a deprivation of increased compensation as the result of a failure to train constitutes an adverse employment action. *See Jordan*, 464 F.3d at 596 ("[D]enial of money would more than amply qualify as a materially adverse action as to any reasonable employee for Title VII purposes."). Because Clay has alleged that he was deprived of increased compensation as the result of a failure to train him on triples, the district court erred in determining that Clay did not suffer an adverse employment action.[6]

#### ii.  Similarly Situated

The district court concluded that Clay had not established the fourth prong of his prima facie case because he did not raise a genuine issue of material fact that similarly situated employees were treated more favorably than was Clay. On appeal we are presented with three different theories as to why Clay has not met this part of his prima facie case.

First, the district found that Clay failed to show that he was treated less favorably than similarly situated, non-protected employees because once UPS resumed training, Clay was provided with triples training before two white drivers with more seniority. Clay alleges that UPS deprived him of training to which he was entitled on the basis of his race. The fact that UPS eventually did train Clay, and may have trained him before two other white people who should have been trained before Clay, does not ameliorate the earlier deprivation. UPS provided triples training to other white drivers, and Clay alleges that once it was his turn to train, UPS suspended training. We reject the district court's theory that because Clay was eventually treated better than two white employees, he could not have been treated worse than other white employees in the past.

Second, UPS argues that Clay is not similarly situated to white drivers who were trained on triples because only qualified drivers who successfully bid on a permanent run during the annual bidding process are entitled to be trained for triples, and because Clay lacked the seniority to bid successfully a permanent run, he was not entitled to train on triples. Clay disputes that there was

---

[6] The dissent asserts that Clay has not alleged an adverse employment action because he eventually received the triples training. Clay alleges that he was denied compensation to which he was entitled. We fail to understand how a loss of pay is anything other than an adverse employment action, regardless of the form in which the deprivation occurred. If a jury determines that Clay was entitled to earlier training and that UPS denied him of this right, Clay should be compensated for his loss. Conversely, if the jury determines that Clay was not entitled to earlier training, then he will not be entitled to remuneration. But at the prima facie stage, we are merely deciding whether Clay has alleged an adverse employment action. Denying an employee compensation to which he or she is entitled certainly qualifies as an adverse employment action.

a permanent-run requirement, supporting his contention with the fact that when he, himself, was finally trained, he had no permanent run, but was only an on-call feeder driver. Clay also points to the affidavit of Thomas Klepsky who also asserted that there was no such requirement.

Third, the district court found that Clay's training grievance was made "on behalf of himself 'and others.'" J.A. at 971 (Op. at 36). According to the district court, all of the "others" referenced in Clay's grievance were white, thus "suggest[ing] that the failure to train did not uniquely disadvantage Clay as a black employee." J.A. at 971-72 (Op. at 36-37). The fourth prong of the prima facie case is "that a person outside the protected class was treated more favorably than" the plaintiff. *Braithwaite*, 258 F.3d at 493. Clay argues, and we agree that, the relevant comparators in this case are the other employees who actually signed the bid sheets. Given that the bid sheets established who was eligible to train for triples, Clay is correct in asserting that the relevant comparators would be those signing the bid sheets. Clay asserts that once his name was next on the list to receive the triples training, UPS stopped providing the training. The fact that there were white drivers below his name who also did not receive training should not prove fatal to his claim. We disagree with the district court's reasoning and hold that the fact that lesser-seniority employees from a non-protected class may be harmed in the wake of discriminatory animus does not necessarily defeat a plaintiff's prima facie case.

Having established that the relevant comparators in this case are the other drivers who signed the bid sheets, Clay asserts that because UPS failed to produce the bid sheets, the district court should have drawn an adverse inference against UPS. We agree. Clay should not be punished for his inability to point to the relevant comparators in this case; rather, UPS's failure to turn over the bid sheets in this case creates an adverse inference in Clay's favor. "[T]he general rule is that [w]here relevant information . . . is in the possession of one party and not provided, then an adverse inference may be drawn that such information would be harmful to the party who fails to provide it." *McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627, 632-33 (6th Cir. 2000) (second and third alteration in original) (internal quotation omitted). Because the district court based its conclusion on an analysis of non-relevant comparators, we conclude that the district court was incorrect in rejecting Clay's prima facie case.

There is a genuine issue of material fact as to whether Clay was qualified to train for triples at the time that he was denied training. Accordingly, Clay has met his burden for setting forth a prima facie case of discrimination, and the burden shifts to UPS to articulate a legitimate, non-discriminatory reason for suspending triples training.

### b. Legitimate, Nondiscriminatory Reason

Supporting its articulated reason with Rudnicki's affidavit, UPS asserts that the reason that it suspended triples training was because it had no supervisors available to provide triples training during the period between February and August 2000. According to UPS, during that period, the six supervisors qualified to train triples drivers were busy training forty new feeder drivers. UPS meets its burden of articulation, and the burden shifts back to Clay to show pretext.

### c. Pretext

In support of his argument that UPS's asserted reason is pretextual, Clay raises genuine issues of material fact as to whether training was suspended between February 2000 and August 2000 in order to train forty, newly hired, feeder drivers. There are two points raised by Clay which rebut UPS's articulated reason. First, according to Clay, the record demonstrates that only eight drivers were hired between July and September 2000, and no new drivers were hired between February and June 2000. These lists are ambiguous, in that they could represent drivers who were both hired *and* trained, not merely hired. However, these lists do raise a legitimate question as to

whether there is any factual basis to UPS's stated reason for suspending triples training on the basis of hiring forty new feeder drivers. The meaning of these lists is a fact question for the jury to determine.

Second, Clay asserts that UPS never raised the issue of needing to train new feeder drivers until it filed its reply brief to the district court in support of its motion for summary judgment. It was not until this point that UPS added a second declaration by Rudnicki asserting that UPS suspended training in order to train the forty new feeder drivers. Clay asserts that up until this time, UPS's stated reason for not training Clay was that it was a "mistake." J.A. at 571-73 (Clay Aff. at ¶¶ 73-85).

Nowhere in UPS's opening brief to the district court in support of its motion for summary judgment does UPS assert that it stopped triples training in order to train newly hired drivers; in fact, it does not assert any reason whatsoever for its decision to suspend triples training. This casts further doubt on the legitimacy of UPS's stated reason. *See Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext."). Because Clay has set forth evidence upon which a reasonable jury could find pretext, we reverse the district court's grant of summary judgment on Clay's disparate-treatment claim.

### 3. Retaliation Claim

The *McDonnell Douglas* burden-shifting approach also applies to retaliation claims. *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). In this case, the parties all use the following construct for establishing whether or not Clay made a prima facie case of retaliation: (1) the employee has engaged in Title VII-protected activity; (2) the employer had knowledge of this fact; (3) the employee suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. *Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 563 (6th Cir. 2004).

Clay argues that his termination was in retaliation for his filing discrimination charges with the OCRC/EEOC. The district court found that Clay had made a prima facie case for retaliation, but that he failed to establish that the legitimate, nondiscriminatory reason articulated by UPS (that Clay violated the three day, no-call, no-show policy) was pretextual. Clay's most compelling argument that UPS's reason was pretextual is that he missed only two consecutive days of work, not three, because the first full day on which he was available for work was September 25 and his termination letter was dated September 26. This evidence certainly tends to show pretext in that UPS's proffered reason does not appear to be anchored in the facts. However, asserting the honest-belief rule, the district court determined that Clay could not show pretext based on UPS terminating Clay after two, rather than three, consecutive days of absence.

In determining whether an employer's stated reason was pretextual, we use a version of the honest-belief rule different from that of the Seventh Circuit:

> Under the "honest belief" rule developed by the Seventh Circuit, "so long as the employer honestly believed in the proffered reason," an employee cannot prove pretext even if the employer's reason in the end is shown to be "mistaken, foolish, trivial, or baseless." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir.1998) (citing, inter alia, *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir.1997)). We have rejected the Seventh Circuit's bare "honest belief" doctrine and instead have adopted a modified honest-belief approach. *Id.* (holding that "[t]o the extent the Seventh Circuit's application of the 'honest belief' rule credits an employer's belief without requiring that it be reasonably based on particularized

> facts rather than on ignorance and mythology, we reject its approach"). *Under this approach, for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." Id.* at 806-07 (defining standard in the context of an Americans with Disabilities Act claim); *see also Balmer v. HCA, Inc.*, 423 F.3d 606, 614 (6th Cir.2005) (applying *Smith* rule in Title VII retaliation case). Even when the employer makes such a showing, "the protection afforded by the rule is not automatic. . . . [O]nce the employer is able to point to the particularized facts that motivated its decision, the employee has the opportunity to produce 'proof to the contrary.'" *Smith*, 155 F.3d at 807 (quoting *Pesterfield v. TVA*, 941 F.2d 437, 443 (6th Cir.1991)).

*Wright*, 455 F.3d at 707-08 (emphasis supplied). Thus, the burden is on the employer to point to specific facts that it had at the time the decision was made which would justify its belief in the proffered reason.

In its initial opinion denying Clay summary judgment, the district court cited only one case, which was decided by the Seventh Circuit, in support of its conclusion that UPS was entitled to the benefit of the honest-belief rule. J.A. at 980 (Op. at 45 n.18) (citing *Billups v. Methodist Hosp.*, 922 F.2d 1300, 1304 (7th Cir. 1991)). The district court's analysis demonstrates that it was not applying our version of the honest-belief rule. The district court asserted "[t]hat UPS may have been mistaken, however, does not raise an issue of fact as to pretext," so long as its belief was honestly held. *Id.* In arriving at this conclusion, the district court conducted no analysis on whether UPS's mistake was "'reasonably based on particularized facts.'"[7] *Wright*, 455 F.3d at 708 (quoting *Smith*, 155 F.3d at 806).

In its subsequent order denying Clay's motion for reconsideration, the district court placed the burden on Clay to show that "[UPS] did not honestly believe [Clay] was available for work." J.A. at 1058 (Recons. Order at 7). But as *Wright* makes clear, the burden is on the employer "to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Wright*, 455 F.3d at 708. UPS has not done so in this case, and thus, does not qualify for protection under the honest-belief rule.

The dissent accuses us of improperly shifting "the burden of proof" to UPS, Dissent at p. 21, because we cite circuit precedent requiring that the defendant's "honest belief" be "reasonably based on particularized facts rather than on ignorance and mythology." *Wright*, 455 F.3d at 708. Because the dissent appears confused about the honest-belief rule, we pause here to clarify. Once the defendant meets its burden of production to articulate a legitimate, non-discriminatory reason supported by admissible evidence, the burden of production shifts to the plaintiff to show that the reason given was pretextual. *Johnson*, 319 F.3d at 866. One way in which a plaintiff may demonstrate pretext is by showing that the reason given by the employer "is ultimately found to be mistaken, foolish, trivial, or baseless." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998). The burden of production is on the plaintiff to demonstrate that the reason given by the employer is "mistaken, foolish, trivial, or baseless." *Id.* If the plaintiff meets this burden and the defendant is silent in the face of the plaintiff's evidence, then the case proceeds to trial to weigh the evidence.

The honest-belief rule is, in effect, one last opportunity for the defendant to prevail on summary judgment. The defendant may rebut the plaintiff's evidence of pretext, by demonstrating

---

**7** We note that the district court's treatment of this issue does not appear to satisfy even the more employer-friendly standard set forth by the Seventh Circuit; the district court stated the Seventh Circuit's rule of law, but did not make a factual finding that UPS's belief was actually honestly held.

that the defendant's actions, while perhaps "mistaken, foolish, trivial, or baseless," were not taken with discriminatory intent. We give the defendant an opportunity to show that its intent was pure, because "the focus of a discrimination suit is on the intent of the employer. If the employer honestly, albeit mistakenly, believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer arguably lacks the necessary discriminatory intent." *Id.*

But we do not apply the honest-belief rule if the plaintiff has not even demonstrated that the defendant's proffered reason appears "mistaken, foolish, trivial, or baseless." *Id.* Thus, we do not improperly shift burdens of production or persuasion by requiring UPS to demonstrate that its honest belief was "'reasonably based on particularized facts.'" *Wright*, 455 F.3d at 708.

The honest-belief rule is inapplicable in this case, and the district court erred in relying on it here. Because Clay has put forth evidence from which a jury could infer pretext, we hold that the district court erred in granting summary judgment to UPS on Clay's retaliation claim.

## D. Marcus Miller

### 1. Facts

From 1989 until 1997 Miller worked for UPS in pre-load as a boxline charger at the Akron center. In 1997, Miller transferred to a position in the North/South slide area of the Akron center where he remained until the end of March 1999.

On September 24, 1998, UPS and the union held a local-level hearing regarding Miller's attendance which resulted in a one-day working suspension. UPS held another hearing on March 4, 1999 to address further alleged attendance problems. This hearing resulted in a two-day suspension. Four days later, on March 8 and 9, UPS asserted that Miller was a "no-call/no-show." J.A. at 1576-77 (Miller Dep. at 269-72). UPS terminated Miller, but the union took the matter to a state panel which reinstated Miller and imposed a twenty-five day suspension. In May 1999, Miller filed discrimination charges with the OCRC/EEOC.

On May 17, 1999, after the twenty-five day suspension elapsed, Miller was reassigned to the re-load shift. The reassignment interfered with his other part-time job. Miller continuously requested to be transferred back to the pre-load shift and was told that he needed to turn in paperwork to the Human Resources department. Miller alleges that other employees had transferred between shifts with no paperwork.

Miller addressed his schedule conflicts with his manager, Mike Smith ("Smith"), who agreed that Miller could be scheduled off until he could return to the pre-load shift. On September 27, 1999, Smith told Miller that he was "receiving pressure" from senior management and that from then on Miller would have to "call in" each day. J.A. at 611 (Miller Aff. at ¶ 37). Calling in meant that an employee called UPS that day to see if he was needed. If the volume was light enough, the employee could remain off and it would not be counted against him for attendance purposes. According to Miller, similar arrangements had been worked out with white employees Tony Capporeletti and Tim Voss. Miller alleges that from September 27 through November 11, 1999, he followed the new procedures and called in each day.

When Miller called in on November 11, 1999, he was told that he had been terminated. Prior to this, Miller had heard nothing from UPS which would give him reason to believe that his termination was imminent. The following day, November 12, Miller received a certified letter from UPS notifying him of his termination pursuant to Article 16 of the CBA, which covers unauthorized leave of absence. On November 16, 1999, Miller received a certified letter from UPS, dated November 5, 1999, that stated that Miller had until November 10, 1999 to call UPS and provide

documentation justifying his absence. Miller grieved his termination, but the state panel upheld UPS's decision.

Miller filed suit against UPS, alleging disparate treatment and retaliation under 42 U.S.C. § 1981 and OHIO REV. CODE §§ 4112.02(A), 4112.99. UPS filed a motion for summary judgment. The district court granted UPS's motion with respect to all of Miller's claims. Miller then filed a motion to reconsider, which the district court denied.

## 2. Disparate-Treatment Claim

On appeal, Miller focuses on his termination as "the crux of his [disparate treatment] claim." Pl.'s Br. at 47. The district court found that Miller failed to make a prima facie case, because he was unable to show that similarly situated white employees were treated more favorably than was Miller. Alternatively, the district court determined that even if Miller did make his prima facie case, he failed to provide evidence from which a jury could infer that UPS's legitimate, non-discriminatory reason for terminating Miller was pretextual. We disagree with the district court on both counts.

With respect to Miller's prima facie case, UPS failed to turn over the 1999 attendance records of Dan Paumier ("Paumier"). The district court acknowledged that Paumier was "a white employee who, like Miller, had grieved his termination and had been reinstated by a state panel with a suspension, presumably also at the 'final warning' stage." J.A. at 962-63 (Op. at 27-28). The district court also found that Paumier had missed over seventy days, compared to Miller's twenty-six. But according to the district court, because, inter alia, these days were in 2003 and 2004 as opposed to 1999 and 2000, Miller could not show that Paumier was similarly situated. In a footnote, the district court acknowledged Miller's argument that UPS failed to turn over Paumier's 1999 attendance records. According to the district court, "[t]his works in [Miller]'s favor to an extent, but [Miller] has not shown that [he] further attempted to depose or get any written statement from Paumier." J.A. at 963 (Op. at 28 n.8).

Miller moved for reconsideration, arguing that the district court should have drawn an adverse inference in Miller's favor for UPS's failure to turn over Paumier's 1999 attendance records. In its order denying reconsideration, the district court restates Miller's argument, but fails to address it, instead stating that even if Miller could make a prima facie case, he failed to demonstrate evidence of pretext.

We address Miller's argument directly, and conclude that the district court should have drawn an adverse inference against UPS for its failure to turn over Paumier's 1999 attendance records. *See McMahan & Co.*, 206 F.3d at 632-33. During 1999, Paumier was similarly situated to Miller in all relevant respects. If Paumier's attendance records revealed that Paumier's attendance was similar to Miller's and that Paumier was not terminated, Miller would easily satisfy the similarly situated component of his prima facie case. Because UPS failed to turn over the records, we assume that Paumier's attendance in 1999 was similar to Miller's attendance. Accordingly, Miller has made a prima facie case of discrimination.

The district court also erred in concluding that Miller had failed to produce evidence from which a jury could infer that UPS's articulated reason for terminating Miller was pretextual. The district court dismissed the suspect chronology of the letters, stating that "although the long delay in getting the letter is somewhat unsettling, Miller has not produced a postmark date, and therefore has not shown that this was anything other than bureaucratic sloppiness." J.A. at 964 (Op. at 29).

We are not clear to whose bureaucratic sloppiness the district court is referring: UPS or the postal service. In any event, by arriving at such a conclusion, the district court drew an improper inference that the delay in Miller's receiving the letters was not intentional on the part of UPS. Such a question is for the finder of fact to resolve. Miller need only provide evidence from which a fact

finder could infer that the reason given for termination was actually pretextual. By supplying an affidavit averring that all of the letters requiring documentation arrived after the deadline for providing that documentation, Miller has met that burden. Moreover, as a factual matter, we question the district court's finding that there was no post mark presented in this case. The Joint Appendix contains a certified mail receipt bearing a post office stamp dated November 16, 1999. J.A. at 1622 (Cert. Mail Receipt). This corresponds with the date on which Miller avers he received the letter stating that he had until November 10 to supply documentation justifying his absences. J.A. at 612 (Miller Aff. at ¶ 46).

Miller has pointed to evidence that UPS sent Miller the letter requesting documentation justifying his absences *after* it sent him his termination letter. Miller was informed of his termination on November 11; he received a certified letter informing him of his termination on November 12; but it was not until November 16 that Miller received the certified letter from UPS dated November 5, 1999 that stated that Miller had until November 10, 1999 to call UPS and provide documentation justifying his absence. A jury could reasonably infer from this sequence of events that UPS's decision to terminate Miller was not actually motivated by Miller's alleged attendance problems.

UPS also argues that Miller cannot demonstrate pretext, because, even though Miller did not receive the letter requesting documentation until after he had been terminated, Miller did not provide UPS with documentation explaining his absences after he had already been terminated. In this case, whether or not Miller provided documentation explaining his absences is irrelevant to our inquiry as to whether UPS's proffered reason for terminating Miller was pretextual. On the facts of this case, it is the timing of the letters that raises the inference of pretext. When and whether Miller responded to these letters tells us nothing about UPS's motives. Accordingly, UPS's argument is without merit.

Because UPS failed to turn over evidence which may have shown that a white employee similarly situated to Miller was treated more favorably than Miller, the district court should have drawn an inference in Miller's favor and found that Miller had met all of the elements of his prima facie case. Because Miller has pointed to evidence in the record from which a jury could infer that UPS's proffered reason for terminating Miller was pretextual, we conclude that the district court erred in entering summary judgment in UPS's favor with respect to Miller's disparate-treatment claim.

### 3. Retaliation

On appeal, Miller has focused his retaliation claim around the fact of his termination. Miller alleges that UPS terminated Miller in retaliation for his filing a discrimination claim with the OCRC/EEOC in May 1999. The district court found that Miller did not make a prima facie case of retaliation because Miller failed to show that there was a causal connection between his filing a discrimination claim with the OCRC/EEOC in May 1999 and his termination in November 1999. The district court asserted that it "is hard-pressed to find temporal proximity to the adverse action Miller claims he suffers as a result—his termination six months later, in November 1999." J.A. at 966 (Op. at 31). In addition, the district court considered the theory that temporal proximity was present in that UPS put Miller on a different shift when he returned from his twenty-five day suspension in May 1999. This was the same month in which Miller filed the discrimination charges. The district court responded that Miller had failed to produce any evidence that UPS knew Miller would have a conflict when it moved him to the other shift, and further, the shift change did not impact on Miller's pay. Therefore, the district court asserted that Miller could not rely on the May shift-change to meet his causation burden.

"[T]emporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007). When coupled with evidence of retaliatory conduct, however, temporal proximity may establish a causal connection between protected activity and an adverse employment action. *Id.* In *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999), we set forth that "[t]he causal connection between the adverse employment action and the protected activity, here the filing of a complaint with the EEOC, may be established by demonstrating that the adverse action was taken shortly after plaintiff filed the complaint and by showing that he was treated differently from other employees."

Miller alleges that when he returned to UPS from his twenty-five day suspension in May 1999, he should have been assigned to pre-load, but was instead assigned to reload. He further alleges that, despite his repeated attempts to be reassigned to pre-load, UPS failed to reassign him. We disagree with Miller. Miller has produced no evidence indicating that UPS knew that Miller would have schedule conflicts if he were assigned to reload as opposed to pre-load. Further, Miller concedes that no pre-load positions were available from the time when he returned from his suspension in May 1999 and the time at which he was terminated in November 1999.

Because the temporal proximity alone is not enough to show a causal connection here, and because Miller has failed to provide sufficient additional evidence of retaliatory conduct, Miller has not met the fourth element of his prima facie case. Accordingly, we affirm the district court's order granting summary judgment on Miller's retaliation claim.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment with respect to Moss's hostile-work-environment claim; we **AFFIRM** the district court's judgment with respect to Moss's disparate-treatment claim insofar as it pertains to the Akron position; we **AFFIRM** the district court's judgment with respect to Miller's retaliation claim; we **REVERSE** the district court's judgment with respect to Moss's disparate-treatment claim insofar as it pertains to the Middleburg Heights position; we **REVERSE** the district court's judgment with respect to Clay's disparate-treatment claim based on failure to train; we **REVERSE** the district court's judgment with respect to Clay's retaliation claim; we **REVERSE** the district court's judgment with respect to Miller's disparate-treatment claim, and we **REMAND** the case for further proceedings consistent with this opinion.

---

### CONCURRING IN PART, DISSENTING IN PART

---

ALICE M. BATCHELDER, concurring in part and dissenting in part. Because I would affirm the district court on all counts, I concur in those portions of the opinion affirming the district court and dissent from those portions reversing. I find the majority's approach unjustified and the precedent worrisome. The majority reverses the established burdens of proof, presuming here that the plaintiffs' allegations are valid and faulting the defendant for failing to produce evidence to disprove those allegations. This departs from established law and creates precedent that effectively prejudges employers as having acted with discriminatory intent until they prove that they have not.

In resolving a motion for summary judgment, the non-moving party "is to be believed, and all justifiable inferences are to be drawn in his [or her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The plaintiffs — non-moving parties to the summary judgment motion — provide ample evidence of their perceived conditions at UPS and their experiences there. To be sure, these plaintiffs were miserable. But, even drawing all reasonable inferences in their favor, this evidence of their personal misery is not enough to create a triable issue of race discrimination, hostile work environment, or retaliation. The district court was thorough and articulate in its reasoning, its explanation of the proffered evidence, and its application of the law. Based on my review of the record and the district court's opinions, I agree that the plaintiffs cannot meet their burden of proof. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) ("It is important to note, however, that although the *McDonnell Douglas* presumption shifts the burden of production to the defendant, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." (quotation marks omitted)).

The majority holds that the district court erred by granting summary judgment to UPS "with respect to Moss's disparate-treatment claim based on the Middleburg Heights position." Maj. Op. § II.B.2.b.ii, at p. 8. But, when the district court entered its June 2005 summary judgment decision, it did not have evidence before it of two separate customer-counter-clerk positions; instead, it had Ms. Moss's claim based on a single position (which the majority has since labeled the "Akron" position), which was filled by an employee with more seniority. The district court did not consider two, separate positions until Ms. Moss moved for reconsideration on the basis of "newly discovered evidence"[1] — i.e., that Margaret Ruddy, a white employee from the Middleburg Heights facility, was given a position desired by Ms. Moss. Upon reconsideration, the district court found, based on a declaration by UPS Human Resources Manager Mike Mick, that one position was reserved for a displaced Akron employee (Teamsters Local 348) and the other for a displaced Middleburg Heights employee (Local 407), and the plaintiff, Ms. Moss, offered no evidence to the contrary.

The majority discards Mick's declaration as inapposite and reverses the district court because "nothing in the record [] establishes that the Middleburg Heights position was reserved for an employee from the Middleburg Heights facility," Maj. Op. § II.B.2.b.i, at p. 7. But *this* is inapposite — under the traditional burdens of proof, it was the plaintiff, Ms. Moss, who was obligated to produce evidence that she was eligible for this second position and that she was similarly situated to Ms. Ruddy. UPS could dispute her eligibility (as it did) but UPS was not obligated to *disprove*

---

[1] Although the district court accepted Ms. Moss's proffer of "new evidence," it is questionable whether this evidence — that there was a second customer-counter-clerk position allegedly desired by Ms. Moss or that Margaret Ruddy was the person who obtained it — was really "newly discovered evidence" for purposes of Fed. R. Civ. P. 60(b)(2), i.e., that could not have been timely discovered with "due diligence" and for which Ms. Moss could reasonably be considered "excusably ignorant." *See Davis v. Jellico Comm. Hosp., Inc.*, 912 F.2d 129, 136 (6th Cir. 1990).

it. UPS is the defendant. The majority states that the district court "provided no citation to the record in support of its factual findings" that Ms. Moss and Ms. Ruddy were not similarly situated, but the majority has this backwards. The district court, following well-settled law, concluded that, because she had no evidence to support her contention, Ms. Moss could not prove that she was qualified (element three) or that she was similarly situated (element four), and therefore, could not establish a prima facie case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case").

The majority also concludes that the district court erred by granting summary judgment to UPS on Mr. Clay's disparate-treatment claim that UPS had failed to provide him with the "triples" training he desired, and Mr. Clay's retaliation claim that UPS fired him in retaliation for his filing discrimination charges with the OCRC and EEOC. I disagree with both of these conclusions.

On the disparate-treatment claim, the majority objects to the district court's determination that, because UPS did *eventually* provide him with triples training, Mr. Clay failed to show an adverse employment action. In reaching its own conclusion, the majority holds that an adverse employment action results from UPS's failure to train Mr. Clay *immediately* (or else compensate him for the delay) because such training would lead to an increase in his pay. *See* Maj. Op. § II.C.2.a.i, at p. 12. I find this new definition of "adverse employment action" incredibly broad — indeed, almost limitless — and cannot agree that a mere delay in providing the desired training is a "materially adverse change in the terms or conditions of employment." *Michael v. Caterpillar Fin. Servs. Corp.*, No. 06-5750, 2007 U.S. App. LEXIS 18154, *17 (6th Cir. July 31, 2007) (quoting *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 410 (6th Cir. 1999)). Therefore, I cannot agree that this constitutes an adverse employment action — especially when the labor relationship is governed by a collective bargaining agreement — or that, whenever an employer decides to delay training, the employer must compensate the employee as though the training had been offered and completed.

On the retaliation claim, the majority finds fault with the district court's application of the "honest-belief rule" and proclaims that "we use a version of the honest-belief rule different from that of the Seventh Circuit." *See* Maj. Op. § II.C.3, at p. 14 (citing *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998))). But the majority's "honest-belief rule" is not an honest-belief rule at all; it is a shifting of the burden of proof to the defendant to disprove discriminatory intent. According to the majority, the defendant must produce sufficient evidence to "demonstrat[e] that the defendant's actions . . . were not taken with discriminatory intent" and "to show that its intent was pure." Maj. Op. § II.C.3, at p. 16.

UPS produced evidence that Mr. Clay was fired because he failed to report to work when called and that the first of several calls was placed on Friday, September 21, 2001. Mr. Clay did not report when called; in fact, he admitted that he did not check his messages until Wednesday, September 26, 2001, the day he was terminated. According to this evidence, Mr. Clay was absent from work for three days (Monday, Tuesday, and Wednesday) and this absence was the proffered basis for his termination. The majority, citing conflicting evidence, explains that the doctor did not approve Mr. Clay to return to work until Monday, September 24, 2001, so he actually missed only two days of work and UPS's purported basis for termination was not "anchored in the facts." From this, the majority concludes that UPS's nondiscriminatory reason for terminating Mr. Clay was pretextual. More to the point, by finding UPS's evidence (excerpts from the Friday, September 21 "feeder log" documenting the first call to Mr. Clay on that day) not sufficiently persuasive, the majority concludes that UPS "does not qualify for protection under the honest-belief rule."

UPS pointed to evidence (i.e., the feeder logs) demonstrating its honest, albeit apparently mistaken belief, that Mr. Clay had missed three consecutive days of work. This is enough to show

an honest belief. The burden remained with Mr. Clay to produce some evidence that this mistaken belief was not honestly held, and indeed, this was the approach taken by the district court. The majority, however, demands that UPS "demonstrat[e] that the [its] actions . . . were not taken with discriminatory intent" and "show that its intent was pure." Maj. Op. § II.C.3, at p. 16. Under the majority's construct, the honest-belief rule is not an additional hurdle for the plaintiff to overcome in proving discriminatory motive, it is an affirmative defense on which the defendant must produce evidence sufficient to convince the trier of fact. Under this construct, summary judgment can never be available, as both sides are now required to produce evidence that will persuade the trier of fact. I do not agree that this circuit has departed from the ordinary rule quite so far, but if I am incorrect and *Wright* and *Smith* actually shift the burden of proof to the defendant, as the majority contends, then this Court should revisit those holdings and reconsider that proposition.

Finally, the majority concludes that the district court erred by granting summary judgment to UPS on Mr. Miller's disparate-treatment claim, in which Mr. Miller alleges that his 26 absences between September 27 and November 11 are an insufficient nondiscriminatory reason for his firing. Maj. Op. § II.D.2, at p. 18. The majority contends that this is pretextual because, four years earlier, UPS had reinstated an employee with 70 absences. The district court found — and I agree — that this other employee was not similarly situated, and 26 absences in under two months is a sufficient non-discriminatory reason to fire an employee. On this issue, the lengths to which the majority goes to find in favor of Mr. Miller speak for themselves and need no further comment.

For all of the foregoing reasons, I respectfully dissent from those portions of the majority opinion that reverse the district court. I would affirm the district court in its entirety.